UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――

ERTHA AUGUSTIN,

                    Plaintiff,

          -vs-

ENLARGED CITY SCHOOL DISTRICT OF
NEWBURGH, et. al, etc.,

                    Defendants.
―――――――――――――――――――――

Civil Action No. 07 Civ 5709 (WCC)

**DEFENDANTS' STATEMENT** FOR **UNDER RULE 56.1 IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

          Defendants, by their attorneys, Shaw, Perelson, May & Lambert, LLP, in support of their

motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, submit

the following statement under Local Rule 56.1.

1.        Plaintiff, a Black female teacher of Haitian descent, was employed by the defendant

          Newburgh Enlarged City School District (hereinafter "District") as a full-time

          probationary elementary education teacher from in or about the beginning of January

          of 2003 until her denial of tenure and termination by the District effective December

          31, 2006. *Complaint ¶ 1*; *Deposition Testimony of Plaintiff at pages 16; Affidavit

          of Mary Ellen Leimer at ¶ 6.*

2.         Plaintiff asserts that the defendants discriminated against her on the basis of her

          national origin in the District denying her tenure and terminating her employment.

          *Complaint ¶ ¶37 and 38*; she contends that the national origin she is asserting in this

          case is "West Indian." *Deposition Testimony of Plaintiff at page 476.*

3.        Prior to her full-time employment by the District, for the period between February

          of 1997 and the commencement of her full-time employment, Plaintiff was employed

as a substitute teacher in each of the District's elementary schools, as well as in the junior high school and the Newburgh Free Academy, the District's high school, during the 1998-1999, 1999-2000 and 2000-2001 school years.  *Deposition Testimony of Plaintiff at pages 10-13 and 15-16.*

4.    During her employment as a substitute teacher by the District, Plaintiff taught all grades from pre-kindergarten to 12th grade.  *Deposition Testimony of Plaintiff at pages 13-14.*

5.    During Plaintiff's employment as a substitute teacher by the District, the District's Human Resources Department received multiple complaints about Plaintiff from other elementary school teachers in the District for whom Plaintiff substituted and elementary school administrators and requests from them that Plaintiff not be reassigned to those teachers' classes when substitute teachers were necessary. As a result, by the time of Plaintiff's full time hire by the District, only one of the District's 11 elementary schools –  Broadway Elementary School – would accept Plaintiff for assignment to perform substitute teaching. *Affidavit of Mary Ellen Leimer at ¶ 6*; *Affidavit of Patricia A. Tompkins at ¶ 2.*

6.    Effective January 6, 2003, Plaintiff was assigned as a regular elementary school teacher to the District's Center Based program at the Calvary School for students on short or long term suspensions from school. This was an in-school program, designed to substitute for the old program of home teaching students on suspension. The Center Based program is one designed to keep students on suspension from their school with other disciplined students in a small class school setting where there are

2

teachers, teaching assistants and/or teacher aides, social workers and school security monitors present on a concentrated basis to address the students' educational and emotional needs. *Affidavit of Mary Ellen Leimer at ¶ 7; Deposition Testimony of Plaintiff at page 19.*

7.    On June 4, 2003, while at the Calvary School, Plaintiff was assaulted by a student and the student's parent or guardian. *Affidavit of Mary Ellen Leimer at ¶ 8; Deposition Testimony of Plaintiff at pages 24-25.*

8.    From June 5, 2003 until September 1, 2004, Plaintiff was maintained on a workers compensation and medical leave and did not perform services for the District. *Affidavit of Mary Ellen Leimer at ¶ 8.*

9.    From the time of the incident in which she was assaulted on June 4, 2003, through to and beyond the termination of Plaintiff's employment by the District, Plaintiff has suffered on a continuous basis from Post Traumatic Stress Disorder ("PTSD"), including the following symptoms of that illness, which become more intense when Plaintiff is under stress: dizziness, vomiting (including vomiting blood), diarrhea, problems maintaining energy levels, problems maintaining concentration, flashbacks to the incident on June 4, 2003 (in which she relives the assault), anxiety and sleeplessness. These symptoms could be brought on by a telephone call from a parent or hearing a door open or close. *Deposition Testimony of Plaintiff at pages 32-41 and 502-505; Deposition Testimony of Dr. Michele Winchester-Vega at page 91.*

9.    As of June 5, 2003, Plaintiff was under the care of Dr. Michele Winchester-Vega ("Dr. Winchester-Vega"), an experienced certified social worker with a Masters

Degree in Social Work and a Doctorate in Social Welfare/Social Work. *Deposition Testimony of Plaintiff at pages 31 to 32; Deposition Testimony of Dr. Michele Winchester-Vega at pages 8-9; Affidavit of Mary Ellen Leimer at ¶ 9 and Exhibit B thereto.*

10.     While out on medical leave, Plaintiff was reassigned to the District's Horizons-on-the Hudson Magnet School ("HOH") and it was anticipated that upon the conclusion of her leave, she would commence her assignment there. *Affidavit of Mary Ellen Leimer at ¶ 9.*

11.      By memo of October 2, 2003, HOH Principal Nancy Colon ("Colon") wrote to Olivia Henderson ("Henderson"), then the District's Executive Director of Early Childhood and Elementary Schools,  District's Assistant Superintendent for Human Resources W. John Knight ("Knight"), and the District's then Executive Director of Human Resources, Mary Ellen Leimer ("Leimer") to complain about the  "terrible" experience that she, other staff members and parents were already having with Plaintiff and to assert that  it would be a "true injustice to our students, parents and staff members to place Mrs. Augustin at Horizons-on-the-Hudson when and if she returns to work." *Affidavit of Mary Ellen Leimer at ¶ 9 and Exhibit B thereto.*

12.     During the second half of the 2003-2004 school year, Dr. Winchester-Vega wrote to Leimer , advising her that Plaintiff had been under her care since June 5, 2003 for treatment of Post Traumatic Stress Disorder, depression and trauma, that Plaintiff was "unable to sustain daily energy level concentration required in the job of teacher," and that Plaintiff  "has flashbacks of the trauma inflicted upon her and has

generalized anxiety features." *Affidavit of Mary Ellen Leimer at ¶ 10 and Exhibit C thereto.*

13. Because Dr. Winchester-Vega did not indicate in her letter that Plaintiff could resume all her duties on a full-time basis, she was requested to advise the District of when Plaintiff could return to work on a full-time basis and she did so by letter of August 16, 2004. *Affidavit of Mary Ellen Leimer at ¶ 10 and Exhibit D thereto.*

14. On June 4, 2004, Plaintiff told Dr. Winchester-Vega that she felt that school administrators treated her differently than the way they treated others. *Deposition Testimony of Dr. Michele Winchester-Vega at page 15.*

15. On July 12, 2004, Plaintiff told Dr. Winchester-Vega that she did not trust administrators employed by the District, particularly building principals and their superiors. *Deposition Testimony of Dr. Michele Winchester-Vega at pages 17-20.*

16. On August 18, 2004, Plaintiff told Dr. Winchester-Vega that she continued to mistrust everyone, that she was not going to make a request for a teaching location (for the 2004-2005 school year) and was going to let the District put her wherever they wanted. *Deposition Testimony of Dr. Michele Winchester-Vega at page 25.*

17. Following receipt of Dr. Winchester-Vega's August 16, 2004 letter, the District had three possible elementary level teaching placements available for Plaintiff for the 2004-2005 school year, one at HOH, one at New Windsor Elementary School ("New Windsor") and one at Gardnertown Fundamental Magnet School, each of which involved replacing a teacher on a one year leave of absence. HOH was considered a poor choice for Plaintiff in light of Principal Colon's earlier objection to Plaintiff's

assignment and, on August 31, 2004, the District assigned Plaintiff effective September 1, 2004 to the first grade teacher vacancy at New Windsor, where her students were 5 and 6 year old children. *Affidavit of Mary Ellen Leimer at ¶ 11; Affidavit of Roberto Calderin at ¶ 1 .*

18.    Prior to her assignment to New Windsor, Plaintiff was experienced with teaching first graders as a substitute teacher, including preparing lesson plans for first grade classes. *Deposition Testimony of Plaintiff at page 63.*

19.    From the beginning of the 2004-2005 school year in September of 2004 and through to her cessation of employment at New Windsor in December of 2004, the Principal of New Windsor , Roberto Calderin, and Assistant Principal of New Windsor, Maritza Ramos, each witnessed that the plaintiff had continuing serious problems with classroom management, including one or both of them witnessing a disorganized, loud and chaotic classroom, a distant and uncommunicative relationship between Plaintiff and her students, Plaintiff having a harsh manner and tone of speaking with her young students, Plaintiff demonstrating a dismissive and demeaning manner of addressing her students, Plaintiff yelling at her students, and Plaintiff's failing to manage her classroom in the hallways. *Affidavit of Roberto Calderin at ¶¶ 3-4; Affidavit of Maritza Ramos at ¶¶ 3-8.*

20.    During the three months of early September through early December of 2004 that Plaintiff was employed as a teacher at New Windsor, both Principal Calderin and Assistant Principal Ramos observed that Plaintiff had an accent, diction, pronunciation and dialect which made it difficult for adults and, even more so,

6

students to understand what she was saying. *Affidavit of Roberto Calderin at ¶ 5*; *Affidavit of Maritza Ramos at ¶ 12.*

21.     Throughout the three months of early September through early December of 2004 that Plaintiff was employed as a teacher at New Windsor, there were many complaints about Plaintiff from parents of students in her class. These complaints continued throughout Plaintiff's three months at New Windsor. They included parental complaints that their children could not understand Plaintiff's pronunciation of words, that the parents could not understand Plaintiff when she spoke to them, that the classroom was unsafe, that Plaintiff yelled at the children, that their children were afraid of Plaintiff, that Plaintiff was rude and abrupt in speaking to the parents, that children in the class were not properly supervised and would go in and out of the classroom unsupervised, that there was no routine in the class, that the children did not know what they were to do in class, that the level of difficulty of the work their children was getting was too low, that their children were falling behind the children in the other first grade classes at the school concerning reading and math and that Plaintiff was not following through on home work. *Affidavit of Roberto Calderin at ¶ 6; Affidavit of Maritza Ramos at ¶ 13.*

22.     Principal Calderin investigated and confirmed that, in fact, Plaintiff's students were far behind the students in the other two first grade classes at New Windsor in reading and math. *Affidavit of Roberto Calderin at ¶ 6.*

23.     When Assistant Principal Ramos reported to Plaintiff the parental complaints she was receiving about Plaintiff, Plaintiff routinely responded to Assistant Principal

Ramos that the complaints were without foundation and that the parents did not like Plaintiff because Plaintiff was Black. *Affidavit of Maritza Ramos at ¶ 13.*

24.    The parental complaints about Plaintiff were so vociferous and frequent so early in the school year that rather than following the normal routine of having the teacher personally address the issues with the complaining parents on her own, in order to show support for Plaintiff, Principal Calderin set up a meeting with the parents of the students in Plaintiff's class with him and Plaintiff so that he could show support for Plaintiff, the parental complaints and concerns could be aired and he and Plaintiff could begin to effectively address them. That meeting was held in mid-October of 2004. *Affidavit of Roberto Calderin at ¶ 8.*

25.    At the mid-October 2004 meeting with the parents, the participants discussed their concerns and Principal Calderin explained to the parents that Plaintiff was new to the first grade and that everyone needed to have patience and to give a little time for Plaintiff to get a handle upon the situation. At the meeting, Plaintiff primarily denied the parents' claims as to what they asserted their children were experiencing in Plaintiff's classroom. *Affidavit of Roberto Calderin at ¶ 9.*

26.    Plaintiff considered it improper and unfair for Principal Calderin to schedule the meeting in mid-October involving himself, Plaintiff and the parents of Plaintiff's students because "I just got assaulted by the parent. The last thing I needed is for me to walk in a room with a bunch of parents yelling and screaming at me ," but Plaintiff did not think Principal Calderin had some improper motive in arranging the meeting. *Deposition Testimony of Plaintiff at pages 71 to 72 and 74.*

8

27.   By memo dated October 26, 2004 to Plaintiff concerning the meeting with the parents, Principal Calderin  reaffirmed to Plaintiff that she needed to develop classroom management strategies, establish an appropriate reward system for her students and take certain actions designed to improve communications with the parents of the children in her classroom. *Affidavit of Roberto Calderin at ¶ 10 and Exhibit B thereto.*

28.   From his informal observations of Plaintiff that followed his memo of October 26, 2004 to Plaintiff, Principal Calderin concluded that at least as regarded developing classroom management strategies, Plaintiff never heeded his memo. *Affidavit of Roberto Calderin at ¶ 10.*

29.   On September 11, 2004 and September 15, 2004, Plaintiff told Dr. Winchester-Vega that she felt Principal Calderin was supportive of her, but on October 30, 2004 she told Dr. Winchester-Vega that she felt betrayed by Principal Calderin, that she did not trust him and that she felt he was "setting me up" in order for her to lose her job. *Deposition Testimony of Dr. Michele Winchester-Vega at pages 35-37 and 48-50.*

30.   On September 29, 2004, Plaintiff told Dr. Winchester-Vega that the reason she had seven complaining parents of students in her classroom was an effort by the District's administration to set her up.   *Deposition Testimony of Dr. Michele Winchester-Vega at pages 38-40.*

31.   Generally, only first-year teachers are assigned a mentor. Mentors are experienced teachers who agree to help the new teacher develop the skills necessary to teach and manage a class. They are selected by the teachers union. The cost of the mentor's

time is paid by the District. The plaintiff, as an experienced teacher, was not entitled to assignment of a mentor. *Affidavit of Roberto Calderin at ¶ 11*; *Affidavit of Maritza Ramos at ¶15*; *Affidavit of Joan Goudy Crosson at ¶42.*

32. Because of Principal Calderin's perception of Plaintiff's lack of teaching and classroom management skills, as well as the fact that he believed that she had not taught first grade before, he made a request for assignment of a mentor for Plaintiff, the request was granted and an experienced teacher at New Windsor, Mrs. Childers, was assigned by the teachers union to serve as Plaintiff's mentor early in the school year. *Affidavit of Roberto Calderin at ¶ 11*; *Affidavit of Mary Ellen Leimer at ¶12.*

33. Plaintiff's mentor, Mrs. Childers, Plaintiff and Principal Calderin met on September 29, 2004 to discuss Plaintiff becoming more familiar with the curriculum for her class, her lack of classroom management and Principal Calderin's concern that Plaintiff's diction made it very difficult for her students to understand her. Principal Calderin there mentioned that there were parental complaints about each of these issues and he and Mrs. Childers made recommendations to Plaintiff concerning methods for addressing these issues. Plaintiff expressed to them that she did not believe there was a problem with her diction and that she did not believe that additional efforts on her behalf in better teaching the curriculum or in addressing classroom management concerns were necessary. Principal Calderin confirmed this conversation at paragraph numbered 5 of a December 1, 2004 memo he issued to Plaintiff. *Affidavit of Roberto Calderin at ¶12 and Exhibit A thereto.*

34. Plaintiff told Dr. Winchester-Vega on November 24, 2004 that she was having

difficulty with her first grade students at New Windsor understanding her because of Plaintiff's articulation. *Deposition Testimony of Dr. Michele Winchester-Vega at pages 68-69.*

35.     Plaintiff told Dr. Winchester-Vega that she believed the parents of her students at New Windsor were complaining about her and subjecting her to discrimination both because she was a foreigner, in the nature of being Haitian and speaking in a different articulation, and because she was Black. *Deposition Testimony of Dr. Michele Winchester-Vega at pages 34-35 and 37-38.*

36.     During the first three months of Plaintiff's employment at New Windsor, Principal Calderin informed Leimer on multiple occasions that Plaintiff's students' parents were voicing vociferous complaints about Plaintiff's performance, including that both students and parents could not understand Plaintiff's diction and dialect, that the classroom was poorly managed, that students were afraid of Plaintiff and that the students were not learning and/or were falling behind the students in New Windsor's other first grade classes and that Principal Calderin had serious concerns about those areas as well as others. *Affidavit of Mary Ellen Leimer at ¶ 10; Affidavit of Roberto Calderin at ¶ 22.*

37.     Principal Calderin performed a formal classroom observation of Plaintiff on October 21, 2004. Pursuant to contract, a formal classroom observation is performed with advance notice and is generally to include a pre-observation conference and post-observation conference with the teacher. Principal Calderin considered Plaintiff's classroom performance on October 21, 2004 to be poor. *Affidavit of Roberto*

*Calderin at ¶ 13-14.*

38.     Though Plaintiff did not make any written comments to Principal Calderin's written report of his formal classroom observation of her, as she was entitled to do, she considered everything Principal Calderin said in his report concerning her performance to be biased and or unfair.  *Deposition Testimony of Plaintiff at pages 75-76, 93-97, 100-101.*

39.     Principal Calderin and Assistant Principal Ramos enlisted the assistance of New Windsor's other first grade teachers and a reading resource group teacher in a process of observing Plaintiff's class, sharing their curriculum with Plaintiff, helping her set up her learning centers and providing feedback to her as to how she could improve her performance. *Affidavit of Maritza Ramos at ¶15 and Exhibit A thereto.*

40.     On November 2, 2004, Plaintiff told Dr. Winchester-Vega that she was resentful about colleagues offering to work with her and defensive about getting help from other teachers and on November 3, 2004, Plaintiff told Dr. Winchester-Vega that the arrangement made to have the other first grade teachers observe her was part of an effort of the District and/or Principal Calderin to set her up.  *Deposition Testimony of Dr. Michele Winchester-Vega at pages 52-53 and 55-56.*

41.     On November 4, 2004, plaintiff attended a meeting with Principal Calderin, Assistant Principal Ramos, Mrs. Childers and the other first grade teachers to set up a support system for her. *Exhibit A to Affidavit of Roberto Calderin, at ¶ 17.*

42.     Following the meeting on November 4, 2004, Plaintiff reported to Dr. Winchester-Vega that the meeting with Principal Calderin, Assistant Principal Ramos, Mrs.

Childers and the other first grade teachers to set up a support system for her was held and stated that maybe Principal Calderin was really trying to help her. She further expressed suspicion of the motivation of her colleagues and admitted to having a fear of being set up to be dismissed. *Deposition Testimony of Dr. Michele Winchester-Vega at page 58.*

43.     Because of more and more frequent complaints from parents of Plaintiff's students as the 2004-2005 school year progressed that they and their children could not understand Plaintiff, Principal Calderin's observations that children in her class appeared to have difficulty understanding her and that it appeared to Principal Calderin that Plaintiff was not doing anything to try to address the concerns he had expressed to her about her articulation and diction, Principal Calderin consulted with Olivia Henderson, his first line supervisor, for advice as to how he might address this problem and was referred by her to Mrs. Tina Schembri, a speech teacher employed by the District.  Ms. Schembri suggested a clinic given in New Paltz, New York which could provide speech support to Plaintiff. *Affidavit of Roberto Calderin at ¶ 18.*

44.     Principal Calderin met with Plaintiff on or about November 16, 2004 to again discuss with her the complaints he was receiving from parents about they and their children not being able to understand Plaintiff, told Plaintiff that her articulation and diction continued to be a problem for her students, told Plaintiff of his conversation with Ms. Schembri  and suggested to Plaintiff that she  consult with Ms. Schembri and contact the New Paltz clinic.  Principal Calderin confirmed that conversation in a memo of

November 16, 2004. *Affidavit of Roberto Calderin at ¶ 19 and Exhibit D thereto*.

45.    Between September and late November of 2004, the parents of Plaintiff's students were demanding of Principal Calderin, Assistant Principal Ramos and the District's administration that their children be transferred from Plaintiff's class to other New Windsor first grade teachers' classes; Principal Calderin and Assistant Principal Ramos opposed any such transfers on the basis that it would open a "floodgate" of transfer demands . *Affidavit of Roberto Calderin at ¶21*; *Affidavit of Maritza Ramos at ¶14*; *Affidavit of Mary Ellen Leimer at ¶ 12.*

46.    Prior to November 30, 2004, the District's administrative offices directed Principal Calderin to transfer one of Plaintiff's students, whose relative was a public office holder, to another New Windsor teacher's first grade class and the transfer demands of the parents of the students in Plaintiff's class escalated. *Affidavit of Roberto Calderin at ¶21*; *Affidavit of Maritza Ramos at ¶14*.

47.    On November 24, 2004, Plaintiff told Dr. Winchester-Vega that she had discovered that a public official had come to the school to insist upon a child being transferred out of her class. *Deposition Testimony of Dr. Michele Winchester-Vega at page* 67.

48.    By late November of 2004, the District concluded that the situation concerning Plaintiff's poor performance, parental complaints and parental transfer demands had to be addressed more forcefully then by attempts to aid Plaintiff as a first grade teacher and on or about November 30, 2004, the District's Human Resources Office instructed Principal Calderin to reassign Plaintiff to her mentor's fifth grade class at New Windsor so that she could develop and improve necessary skills which she

appeared to lack through direct exposure to the performance of a successful experienced teacher. *Affidavit of Mary Ellen Leimer at ¶ 13; Affidavit of Roberto Calderin at ¶23.*

49.   On December 1, 2004, after being instructed by the District to reassign Plaintiff to Mrs. Childers' fifth grade classroom, Principal Calderin held a meeting with Assistant Principal Ramos, Plaintiff and her union representative (Ms. Angela Sartori) to discuss Plaintiff's reassignment. At the time of that meeting, Principal Calderin  provided the plaintiff with a December 1, 2004 memo which informed Plaintiff of her reassignment to Mrs. Childer's fifth grade class based upon her "unacceptable pattern of inconsistent pedagogy, classroom management, and parental complaint" and reviewed with Plaintiff some of the parental complaints that had been made against her, such as that there was no feedback on homework, that their children were afraid of her and that the children could not understand Plaintiff's pronunciation of words. Plaintiff responded that many of those complaints were "lies." Plaintiff also stated that the parents of her students had turned on her because of her skin color and her accent, that her speech was a matter of her accent and that she believed her speech was not a problem for her students. *Affidavit of Mary Ellen Leimer at ¶ 14;Affidavit of Roberto Calderin at ¶ 24;  Deposition Testimony of Plaintiff at pages 166 and 168.*

50.   Plaintiff contends that she was reassigned by the District and/or Principal Calderin to Mrs. Childers fifth grade classroom to be Mrs. Childer's "maid." *Deposition Testimony of Plaintiff at pages 158-159.*

51.    Plaintiff believed and continues to believe that Principal Calderin's treatment of her

and the decisions he made concerning her at New Windsor were based on her race,

i.e., because she was Black.  *Deposition Testimony of Plaintiff at pages 160-165.*

52.    The District has a Nondiscrimination Policy (No. 3100), adopted on November 30,

2004 to replace an earlier policy,  which provides in relevant part that the District

and "its officers, employees and agents, shall not discriminate against any . . .

employee . . . on the basis of . . . national origin . . . in its . . . employment practices."

It further specifies that the District's "policy of nondiscrimination includes, but is not

limited to:  . . . opportunities for advancement and/ or terminations." It further

provides:

> Any individual who believes that he or she has been
> discriminated against is encouraged to inform the appropriate
> official designated by the School District to hear such
> complaints of alleged discrimination. The designated official
> shall provide the complainant with information regarding the
> School District's policy prohibiting discrimination and the
> grievance/complaint procedures available to such individual.

*Affidavit of Mary Ellen Leimer at ¶ 2 and Exhibit A thereto.*

53.    The District has an established complaint procedure, which commences with the

making of a complaint to a Compliance Coordinator. Since July of 2006, Leimer has

been that Coordinator. Prior to July of 2006, Leimer shared that responsibility with

Assistant Superintendent for Human Resources Knight. *Affidavit of Mary Ellen

Leimer at ¶ 3.*

54.    The District's Nondiscrimination Policy and complaint procedure is communicated

to all teachers. They were communicated to Plaintiff no later than December 1, 2004

by a statement on a memo of that date (marked as Defendant Exhibit G during the

deposition of Plaintiff) from Principal Calderin to Plaintiff, which advised her:

> The Newburgh Enlarged City School District offers equal
> educational and employment opportunities without regard to
> age, religion, race, creed, color, national origin, sex,
> disability, barrel status, military status, sexual orientation,
> genetic predisposition or carrier status. Mr. John Knight and
> Mrs. Mary Ellen Leimer are the District's Compliance
> Coordinators for Title IX /EEO . . . . They can be reached at
> telephone 845-563-3400.

*Affidavit of Mary Ellen Leimer at ¶ 4;Affidavit of Roberto Calderin at ¶ 27 and*

*Exhibit A thereto; Deposition Testimony of Plaintiff at pages 128-129.*

55.     Plaintiff does not know whether she wanted to make a complaint of discrimination

concerning Principal Calderin and the only complaint she recalls making to the

District was a message she left with a secretary to the Superintendent of Schools that

the way she was being treated by Mrs. Childers at New Windsor was "unhuman",

that she had been a victim once when she had been assaulted and that she refused to

be a victim again. *Deposition Testimony of Plaintiff at pages 163-165, 173 and 232-*

*233.*

56.     At Leimer's request, Principal Calderin prepared an Educator Improvement Plan

("EIP") with the District's Director of Reading and English Language Arts, Margaret

Burpee, for Plaintiff, to be implemented during her assignment to Mrs. Childers' fifth

grade class. As stated in the Overview portion of that plan, there was a consensus

among Principal Calderin, Assistant Principal Ramos, Mrs. Childers, and Director

Burpee that there were serious issues concerning Plaintiff's lack of consistent

delivery of instruction, lack of classroom management, ongoing parental complaints,

poor collegial relations between Plaintiff and other teachers, student safety and Plaintiff's relationship with the students under her supervision. In consultation with Mrs. Burpee, Principal Calderin concluded and wrote in the concluding paragraph of the Plan:

> Additionally, it is recommended that Mrs. Augustin address issues specific to enunciation and diction if she is to continue to service children in the literacy development years, and seek EAP counseling for issues specific to attitude, parent relations, and professional behavior. Notwithstanding, attempts to address these issues do not ensure that tenure or a permanent appointment is forthcoming. Moreover, it does not ensure that attempts to improve areas of weakness guarantee her continued employment with the district if her progress is not deemed satisfactory by her supervisor.

*Affidavit of Roberto Calderin at ¶ 28 and Exhibit E thereto.*

57.    An EIP is prepared for a probationary teacher where a school district considers a probationary teacher's performance to be unsatisfactory. *Affidavit of Mary Ellen Leimer at ¶ 15.*

58.    The EIP prepared by Principal Calderin and Director Burpee for Plaintiff was never implemented because Plaintiff ceased to participate in Mrs. Childers' fifth grade class and was transferred at her request, as communicated to the District by her teachers union, to the Center Based Program then located at West Street. *Affidavit of Mary Ellen Leimer at ¶¶ 15-19;Affidavit of Roberto Calderin at ¶ 30; Deposition Testimony of Dr. Annette Saturnelli at page 24.*

59.    The District was concerned about again assigning Plaintiff to the Center Based program because of Plaintiff's injuries suffered in the June 4, 2003 assault upon her by a parent and a student during her prior assignment to that program at Calvary

School and the fact that her son already had a pending lawsuit against the District arising out of that assault and unsuccessfully sought to secure an agreement from Plaintiff (1) that her transfer from the New Windsor School was voluntary and being made free of duress or coercion, (2) that she would not commence any action, lawsuit or grievance based upon the transfer or the underlying reasons for the transfer and (3) that she would not use or attempt to use the transfer or its underlying reasons in connection with the litigation brought by her son against the District. This delayed implementation of her assignment until March 16, 2005. *Affidavit of Mary Ellen Leimer at ¶¶17-19.*

60. On January 25, 2005, Plaintiff told Dr. Winchester-Vega that the white world was unfair and that she felt she would have been protected from the assault on June 4, 2003 if she had been white. *Deposition Testimony of Dr. Michele Winchester-Vega at pages 77-79.* Plaintiff confirmed that belief in her deposition in this action. *Deposition Testimony of Plaintiff at pages 374-375.*

61. On March 15, 2005, Plaintiff told Dr. Winchester-Vega that she felt conflicted about her assignment to the Center Based program at West Street and that she didn't want to teach an "at-risk" population, but felt too vulnerable to reject such an assignment for fear of losing her job. *Deposition Testimony of Dr. Michele Winchester-Vega at pages 83-84.*

62. On March 23, 2005, Plaintiff told Dr. Winchester-Vega that she wondered about whether her being assigned to the West Street School was part of a "setup" by the District to get rid of her and that the District didn't care when students did things to

minority teachers. *Deposition Testimony of Dr. Michele Winchester-Vega at pages 85-86.*

63.    The building principal at West Street, where the elementary school students in the Center Based program were being taught during the 2004-2005 school year, was Art Mamazza. *Affidavit of Mary Ellen Leimer at ¶20.*

64.    On March 30, 2005, Plaintiff told Dr. Winchester-Vega that she felt Principal Mamazza was avoiding her and that the District was setting her up. *Deposition Testimony of Dr. Michele Winchester-Vega at pages 87-88.*

65.    On April 8, 2005, Plaintiff told Dr. Winchester-Vega that several children and an aide had expressed to her that she looked like she was afraid, that several children had asked Plaintiff why are you afraid and had expressed to her that they were not going to kill her, and that Plaintiff had had a PTSD flashback in the nature of wanting to cry and run away as three boys walked towards her together at school. *Deposition Testimony of Dr. Michele Winchester-Vega at pages 88-90.*

66.    On April 18, 2005, Plaintiff told Dr. Winchester-Vega that she would jump when she heard a door slam or after hearing a noise at school, that Plaintiff found herself on the verge of tears whenever she saw students fighting, that Plaintiff had had several bouts of diarrhea and that Plaintiff was aware that she was having her aide or security guards telephone parents in order for Plaintiff to avoid parental contacts. *Deposition Testimony of Dr. Michele Winchester-Vega at pages 91-92.*

67.    For the 2005-2006 school year, the District's Center Based program was moved out of West Street and was situated at St. Francis. Defendant Joan Goudy-Crosson, who

administered the Center-Based program for the 2003-2004, 2004-2005 and 2005-2006 school years, was the building administrator/principal for St. Francis. She is a long-tenured administrator in the District. *Affidavit of Mary Ellen Leimer at ¶21; Affidavit of Joan Goudy-Crosson at ¶2; Deposition Testimony of Joan Goudy-Crosson at page 7.*

68. On August 27, 2005, Plaintiff told Dr. Winchester-Vega that she had been assigned defendant Goudy-Crosson as her principal for the following school year, that no one who had ever worked for defendant Goudy-Crosson had a good recommendation and that Plaintiff's colleagues had shared with Plaintiff that the colleagues had been treated poorly by defendant Goudy-Crosson. *Deposition Testimony of Dr. Michele Winchester-Vega at page 95.*

69. Defendant Goudy-Crosson, an African-American female administrator employed by the District, has never previous to this action been accused of having a bias against any person because of their national origin. *Affidavit of Joan Goudy-Crosson at ¶6;Affidavit of Mary Ellen Leimer at ¶50 .*

70. The Complaint in this case states at paragraphs 31 and 32 thereof that the District has terminated several Caribbean teachers and that the District had a special education teacher from the Caribbean against whom a high-ranking Caucasian administrator made explicitly biased comments. Plaintiff can only identify a single Caribbean teacher apart from herself whom she believes was the subject of discrimination or bias by the District: Daceta Simpson. *Complaint ¶¶31 and 32; Deposition Testimony of Plaintiff at pages 482-491;  Affidavit of Joan Goudy-Crosson at ¶5.*

21

71.    In or about September of 2001, while she was the principal of the District's Heritage School, defendant Goudy-Crosson interviewed and then recommended Daceta Simpson for initial hire by the District as a special education teacher to work for defendant Goudy-Crosson at Heritage Junior High School, where defendant Goudy-Crosson was the principal. On defendant Goudy-Crosson's recommendation, in or about October of 2001, Ms. Simpson was hired by the District and assigned to work under defendant Goudy-Crosson at Heritage Junior High School in a 12:1:1 (i.e.,12 students, one teacher, one teachers aide) special education class. Ms. Simpson was Jamaican, with a distinctive Caribbean accent and dialect. *Affidavit of Joan Goudy-Crosson at ¶7.*

72.    Defendant Goudy-Crosson played no role in the District's decision to deny tenure to and terminate Daceta Simpson as she was not working in any school defendant Goudy-Crosson administered, nor was she otherwise under defendant Goudy-Crosson's supervision in Ms. Simpson's last few of years of employment by the District. *Affidavit of Joan Goudy-Crosson at ¶8.*

73.    The tenure recommendation process in the District is that the District's Human Resources Department makes a recommendation to the Superintendent of Schools, who usually relies upon that recommendation for her recommendation to the District's Board of Education ("Board"). If the teacher requests reasons for an adverse recommendation, the Human Resources Department provides the Superintendent with the reasons (that underlay the Human Resources Department's recommendation) and drafts the Superintendent's response to the teacher of the

reasons for the recommendation, which the Superintendent must provide to the teacher pursuant to the Education Law. This correspondence and any response by the teacher is provided to the Board for its consideration in voting whether or not to adopt the Superintendent's recommendation for tenure denial and terminate the teacher. The Superintendent routinely does not perform any investigation as concerns Human Resources' recommendation. She relies upon its recommendation for her decision. *Affidavit of Mary Ellen Leimer at ¶23;  Deposition Testimony of Dr. Annette Saturnelli at pages 8-9;  Deposition Testimony of Mary Ellen Leimer at pages 6 and 9.*

74.   The plaintiff's initial three year period as a full-time tenure track teacher was to conclude as of on or about December 31, 2005. By that date, under the Education Law, Plaintiff would either have to be granted tenure by the Board upon recommendation by the Superintendent of Schools or be terminated from employment by vote of the Board. *Affidavit of Mary Ellen Leimer at ¶22.*

75.   Prior to the commencement of the 2005-2006 school year, Assistant Superintendent Knight and Leimer decided that in light of Plaintiff's very limited time of approximately twelve months actually functioning as a full time teacher for the District since January of 2003, her troubled history as a substitute teacher that other teachers or administrators had complained about and objected to, the serious performance problems she had demonstrated at New Windsor as reported to them by Mr. Calderin and their knowledge of multiple parental complaints about Plaintiff at New Windsor, they could not recommend to the Superintendent that Plaintiff be

granted tenure. *Affidavit of Mary Ellen Leimer at ¶24.*

76.  Prior to the commencement of the 2005-2006 school year, Assistant Superintendent Knight and Leimer discussed with defendant Superintendent Saturnelli a recommendation for denial of tenure to, and termination of, Plaintiff effective December 31, 2005. They also discussed a concern that the District had never adopted an EIP for Plaintiff and that the lack of such a plan might entitle Plaintiff to a fourth year of probation before they could recommend denial of tenure and termination of her employment. *Affidavit of Mary Ellen Leimer at ¶24.*

77.  Defendant Saturnelli, Assistant Superintendent Knight and Leimer decided to offer Plaintiff a fourth year of probation and to adopt an EIP for Plaintiff so that the lack of an EIP would not continue to be a potential impediment to a recommendation to deny Plaintiff tenure and terminate her employment. *Affidavit of Mary Ellen Leimer at ¶25.*

78.  The District's counsel prepared and provided to Leimer an extension agreement (also known as a JUUL agreement) for the District to enter into with Plaintiff. The extension agreement was presented to Plaintiff by cover letter from Leimer dated August 24, 2005 (with a copy to defendant Goudy-Crosson), advising that it had to be signed by August 31, 2005. *Affidavit of Mary Ellen Leimer at ¶25;Affidavit of Joan Goudy-Crosson at ¶31.*

79.  Plaintiff avoided signing the extension agreement by the August 24, 2005 deadline and Leimer contacted defendant Goudy-Crosson to insist that she direct Plaintiff to contact Leimer at the beginning of the school year concerning the still unexecuted

extension agreement. Leimer thereafter contacted defendant Goudy-Crosson a number of times during the first week of the school year to impress upon her the urgency of Plaintiff contacting Leimer about the extension agreement. *Affidavit of Mary Ellen Leimer at ¶25;Affidavit of Joan Goudy-Crosson at ¶31.*

80.	During the very first week of the 2005-2006 school year, defendant Goudy Crosson contacted Plaintiff to advise her that she needed to contact Leimer concerning the tenure extension agreement that the District insisted Plaintiff sign in order to avoid a termination of her employment. *Affidavit of Joan Goudy-Crosson at ¶31.*

81.	Absent execution by Plaintiff of the extension agreement, a recommendation would be made to the Board of Education that Plaintiff be denied tenure and terminated effective no later than December 31, 2005. *Affidavit of Mary Ellen Leimer at ¶25.*

82.	During a discussion between Plaintiff and defendant Goudy-Crosson on September 8, 2005 concerning Plaintiff's need to promptly contact Leimer and sort out the tenure extension agreement, as defendant Goudy-Crosson insisted to Plaintiff that she was simply giving Plaintiff the directive to contact Leimer that defendant Goudy-Crosson had received from Leimer, Plaintiff stated to defendant Goudy-Crosson that "I may be an immigrant, but I'm not stupid." *Affidavit of Joan Goudy-Crosson at ¶32 and Exhibit E thereto.*

83.	Defendant Goudy-Crosson states under oath that the September 8, 2005 statement by Plaintiff that "I may be an immigrant, but I'm not stupid" is the only time that the the term "immigrant" was stated by either Plaintiff or defendant Goudy-Crosson during any conversation between them. *Affidavit of Joan Goudy-Crosson at ¶32 and*

*Exhibit E thereto.*

84.    Defendant Goudy-Crosson states under oath that she responded to Plaintiff's "I may be an immigrant, but I'm not stupid" remark by stating: "Ms. Augustin, I am not the enemy here, I am relaying a directive to you from my supervisor." *Affidavit of Joan Goudy-Crosson at ¶32 and Exhibit E thereto*.

85.    On November 2, 2005, defendant Goudy-Crosson issued a "Letter of Critical Evaluation" to Plaintiff that made reference to her September 8, 2005 conversation with Plaintiff and the context of the Plaintiff's remark that "I may be an immigrant, but I'm not stupid."*Affidavit of Joan Goudy-Crosson at ¶32 and Exhibit E thereto.*

86.    On November 10, 2005, Plaintiff told Dr. Winchester-Vega that she was fearful of defendant Goudy-Crosson making a case to remove her from her job, that defendant Goudy Crosson had warned Plaintiff about her having an offensive tone of voice and that defendant Goudy Crosson had written Plaintiff up for saying "I may be an immigrant but I am not stupid" because defendant Goudy Crosson felt it was argumentative. *Deposition Testimony of Dr. Michele Winchester-Vega at pages 101-107.*

87.    Plaintiff responded to defendant Goudy-Crosson's November 2, 2005 Letter of Critical Evaluation to Plaintiff by a memo to defendant Goudy-Crosson dated November 14, 2005. This document, Exhibit F to the Affidavit of defendant Goudy-Crosson submitted herewith, was marked as Defendants Deposition Exhibit Y during the deposition of Plaintiff.  *Deposition Testimony of Plaintiff at page 338.* Concerning Plaintiff's September 8, 2005 statement that "I may be an immigrant, but

I'm not stupid," Plaintiff stated in her November 14, 2005 letter that: "Also, the discussion where I made a comment about my immigrant status and level of intelligence was in response to an incorrect date on the tenure extension letter which was subsequently changed." Plaintiff's November 14, 2005 letter made no reference to any other circumstances which would have elicited her "I may be an immigrant" remark; nor did it refer to defendant Goudy-Crosson making any statement using the word "immigrant." *Affidavit of Joan Goudy-Crosson at ¶33 and Exhibit F thereto.*

88.     Plaintiff admits that she made the remark "I may be an immigrant, but I'm not stupid," in her conversation with defendant Goudy-Crosson  on September 8, 2005 in response to an incorrect date on the tenure extension agreement which was subsequently changed, but also states that Plaintiff made that statement following a further comment by defendant Goudy-Crosson "something to the effect" of that either "that is why she [defendant Goudy-Crosson]wanted Jon Hunt in the elementary level, not an immigrant" or that defendant Goudy-Crosson "didn't want an immigrant in her [Plaintiff's] classroom, but wanted Jon Hunt." *Deposition Testimony of Plaintiff at pages 314-316, 321-323 and 337-343.*

89.     Plaintiff does not have a clear recollection of what defendant Goudy-Crosson actually said to her on September 8, 2005 concerning defendant Goudy-Crosson not wanting an immigrant, but instead wanting Jon Hunt.   *Deposition Testimony of Plaintiff at page 322.*

90.     On September 10, 2005, Plaintiff told Dr. Winchester-Vega that she had anxiety and nausea during work, needed to run to the bathroom and vomited in the classroom.

*Deposition Testimony of Dr. Michele Winchester-Vega at pages 98-99.*

91.   On September 17, 2005, Plaintiff told Dr. Winchester-Vega that she was feeling pressure by defendant Goudy Crosson to sign the letter extending her probation period. *Deposition Testimony of Dr. Michele Winchester-Vega at pages 100-101.*

92.   Commencing in September of 2005 and continuing through the 2005-2006 school year, Plaintiff had observable serious classroom management problems in controlling her students at St. Francis and in getting them to do the schoolwork assigned by their originating schools. *Affidavit of Joan Goudy-Crosson at ¶¶ 9-28; Affidavit of Rikki Pearson at ¶¶ 4-10; Affidavit of Elsie Bryant at ¶¶ 3-7; Affidavit of Wihlemena Lamb at ¶ 14; Affidavit of Carrie Frost at ¶¶ 5 and 6; Affidavit of Patricia A. Tompkins at ¶¶ 4 and 7-9; Affidavit of Norma Yvette Norat at ¶¶ 6-8.*

93.   Because of Plaintiff's observable serious classroom management problems, defendant Goudy Crosson established a rule early in the school year that Plaintiff was never to be in a classroom alone with her students. *Affidavit of Joan Goudy-Crosson at ¶ 18; Affidavit of Rikki Pearson at ¶ 5; Affidavit of Wihlemena Lamb at ¶ 14.*

94.   On September 10, 2005, Plaintiff told Dr. Winchester-Vega that she had been told by Rikki Pearson that defendant Goudy Crosson had requested that Plaintiff never be alone with students in the classroom. *Deposition Testimony of Dr. Michele Winchester-Vega at page s 96-98.*

95.   Because of Plaintiff's observable serious classroom management problems, early in the school year defendant Goudy Crosson established a security post for the school

28

monitors right outside Plaintiff's classroom so that, normally, a school monitor would be available to assist Plaintiff in the event of any serious classroom management problems that might arise. *Affidavit of Joan Goudy-Crosson at ¶ 21; Affidavit of Wihlemena Lamb at ¶ 7.*

96.   Commencing in or about October of 2005 and continuing to the end of January of 2006,  defendant Goudy Crosson, Leimer, Plaintiff and her union representative, Philip Cordella, were involved in weekly meetings and discussions for the purpose of formulating an EIP for Plaintiff; at those meetings, defendant Goudy-Crosson would comment upon what she had observed of the plaintiff's performance earlier that week and where improvement was noted or needed. *Affidavit of Joan Goudy-Crosson at ¶ 43*; *Affidavit of  Patricia A. Tompkins at ¶ 11*; *Affidavit of Mary Ellen Leimer at ¶ 27.*

97.   The EIP for Plaintiff went through multiple drafts between October of 2005 and January 31, 2006 because of objections communicated by Plaintiff's union representative and portions were implemented before the EIP was finalized. *Affidavit of Joan Goudy-Crosson at ¶ 42; Affidavit of Mary Ellen Leimer at ¶¶ 27-28.*

98.   During the discussions concerning the EIP, Plaintiff stated that she did not need an EIP or help and that there was nothing deficient in her performance as a teacher at St. Francis. *Affidavit of Joan Goudy-Crosson at ¶ 42; Affidavit of Mary Ellen Leimer at ¶ 27.*

99.   The final EIP was never agreed to by the plaintiff and her union and was issued unilaterally by the District on January 31, 2006 after agreement could not be reached.

*Affidavit of Joan Goudy-Crosson at ¶ 42; Affidavit of Mary Ellen Leimer at ¶ 27 and Exhibits J, K, L and M thereto.*

100.   Twice during the time of the  EIP formulation process, on October 31, 2005 and December 14, 2005, defendant Goudy-Crosson performed classroom observations of Plaintiff.  *Deposition Testimony of Plaintiff at pages 317-320, 413-415 and 433.*

101.   Plaintiff's EIP could be interpreted as to only require a single formal  observation be performed by defendant Goudy-Crosson prior to February 15, 2006 and that the others be performed by Mrs. Henderson, Mrs. Sobel or Mrs. Burpee. *Affidavit of Mary Ellen Leimer at ¶ 30 and Exhibits I and M thereto; Deposition Testimony of Joan Goudy-Crosson at pages 42-44.*

102.   Defendant Goudy-Crosson was never given any instruction or direction as to what she was to do concerning the EIP. Noone from the Superintendent's Office, Human Resources Department, nor any other administrator, ever advised defendant Goudy-Crosson  that she had some further obligation concerning formal observations for Plaintiff beyond those she had performed in October and December of 2005. *Affidavit of Joan Goudy-Crosson at ¶ 44; Affidavit of Mary Ellen Leimer at ¶ 29.*

103.   Since, as of January 31, 2006, defendant Goudy-Crosson  had already performed two formal pre-scheduled classroom observations of Plaintiff, since under the collective bargaining agreement between the teachers union and the District, this was all Plaintiff was entitled to receive and since the initial drafts of the EIP called for the first two formal classroom observations to be completed by December 15, 2005 and January 15, 2006, defendant Goudy-Crosson presumed that the two observations she

had performed on October 31, 2005 and December 14, 2005 met the requirements in the EIP for formal observations by defendant Goudy-Crosson as the principal. *Affidavit of Joan Goudy-Crosson at ¶ 44 and Exhibit G thereto; Deposition Testimony of Joan Goudy-Crosson at pages 44-45, 49, 51 and 52-54.*

104.    Though the EIP provided that additional persons to defendant Goudy-Crosson would be observing Plaintiff under the EIP, i.e., Mrs. Henderson, Mrs. Sobel or Mrs. Burpee, no one told defendant Goudy-Crosson that she should take the initiative in arranging these formal observations by these administrators and Human Resources failed to follow-up to make sure that these formal observations were performed by these administrators; they were not performed. *Affidavit of Joan Goudy-Crosson at ¶ 44; Affidavit of Mary Ellen Leimer at ¶¶ 29 and 30.*

105.    Defendant Goudy-Crosson was not the person with ultimate responsibility for ensuring that the observations called for under Plaintiff's EIP were performed; that responsibility was shared with defendant Goudy-Crosson by Henderson, Sobol and Burpee, each of whom were higher level administrators than defendant Goudy-Crosson. *Deposition Testimony of Dr. Annette Saturnelli at pages 17-18.*

106.    Defendant Goudy-Crosson has an employment history of failure to perform required observations and evaluations of teaching staff which has been the source of negative comments in her evaluations by her superiors for a period of three years preceding the 2005-2006 school year. *Affidavit of Mary Ellen Leimer at ¶¶ 31 and 32 and Exhibit O thereto.*

107.    Under the "Area of Concern" section of Plaintiff's EIP regarding "Managing

Classroom Procedures" for which the specified improvement measurement criteria (i.e., "eval. of progress toward goal") was "Observation by the Principal," the "Observation by the Principal" reference was not to a "formal observation" such as is referred to in the "Instruction" Area of Concern in Plaintiff's EIP, but to what defendant Goudy-Crosson would observe of Plaintiff in different locations throughout the school. *Deposition Testimony of Mary Ellen Leimer at pages 19-20 and Exhibits I and M thereto.*

108.    Under the section of Plaintiff's EIP regarding "Managing Classroom Procedures" for which the specified "timeline" was "Meeting with the Principal twice before April 30, 2006," Leimer understood that defendant Goudy-Crosson would be meeting with Plaintiff to discuss Plaintiff's progress or deficiencies with respect to the management of classroom procedures. *Deposition Testimony of Mary Ellen Leimer at pages 20-21 and Exhibits I and M thereto.*

109.    Defendant Goudy-Crosson met with Plaintiff informally at different times under the EIP between February 1, 2006 and May 5, 2006. *Deposition Testimony of Joan Goudy-Crosson at page 50.*

110.    On November 9, 2005, in a telephone conversation, Plaintiff told Dr. Winchester-Vega that Plaintiff could not handle her job. *Deposition Testimony of Dr. Michele Winchester-Vega at pages 102-103.*

111.    On Wednesday, November 23, 2005, in a telephone conversation, Plaintiff told Dr. Winchester-Vega that she had a meeting with defendant Goudy Crosson and Leimer the prior Monday in which Plaintiff's classroom management was questioned.

32

*Deposition Testimony of Dr. Michele Winchester-Vega at pages 109-110.*

112.    On November 28, 2005, Plaintiff reported to Dr. Winchester-Vega that she was
        experiencing dizziness, vomiting and diarrhea most days at school. *Deposition
        Testimony of Dr. Michele Winchester-Vega at page 111.*

113.    On December 19, 2005, Plaintiff told Dr. Winchester-Vega that she believed that the
        District was directing defendant Goudy Crosson to write Plaintiff up. *Deposition
        Testimony of Dr. Michele Winchester-Vega at pages 112-113.*

114.    On February 2, 2006, Plaintiff told Dr. Winchester-Vega that she was of the view
        that defendant Goudy Crosson was feeling more positive towards her and on March
        15, 2006, Plaintiff told Dr. Winchester-Vega that she felt that at that point defendant
        Goudy Crosson did not want her out of St. Francis. *Deposition Testimony of Dr.
        Michele Winchester-Vega at pages 113 and 116.*

115.    On June 16, 2006, as defendant Goudy-Crosson was leaving St. Francis for a
        meeting, Plaintiff entered the main office and advised defendant Goudy-Crosson
        that a student had called her names using curse language. Defendant Goudy-Crosson
        directed one of the school's social workers to intervene and went to her meeting.
        When defendant Goudy-Crosson returned to St. Francis, staff members approached
        her and told her that "Ms. Augustin lost it," and that Plaintiff had left her classroom
        screaming in the hallway "get her out of my damn room. Either she goes or I go."
        Defendant Goudy-Crosson  was told by the staff that Plaintiff's voice level was so
        high when she was making these statements that teachers had run into the hallway
        from their classrooms. Defendant Goudy-Crosson  was also told by the school's two

security officers that they had asked Plaintiff to lower her voice and refrain from cursing out loud and that Plaintiff had then replied to them "was I cursing? I wasn't cursing!" *Affidavit of Joan Goudy-Crosson at ¶ 47 and Exhibit I thereto.*

116.   Plaintiff admits that on June 16, 1006, she made the statement concerning the student that "either she goes or I go," that the security guard said she was cursing and that she may have said "Was I cursing, I wasn't cursing." *Deposition Testimony of Plaintiff at pages 445, 447 and 448.*

117.   When defendant Goudy-Crosson entered Plaintiff's classroom on June 16, 2006, she discovered Plaintiff telling her students that "this Father's Day project is not working," to which the students responded by moaning out loud. Surveying the room, defendant Goudy-Crosson noted that of the nine students in the class, one had his head down on his desk, another was standing next to his chair, and two were talking to each other. No lesson seemed to defendant Goudy-Crosson to be in progress. Defendant Goudy-Crosson noted that a moment later, Plaintiff stated "I'm passing out paper, you have two minutes to finish" without giving any further directions to the students. Defendant Goudy-Crosson also noted that one of the students, a first grader, complained that the work was of to high a grade level for him. Defendant Goudy-Crosson also noted that written on the blackboard were the words "June 14 is flag day," even though that day had passed two days earlier. *Affidavit of Joan Goudy-Crosson at ¶ 47 and Exhibit I thereto.*

118.    Defendant Goudy-Crosson  memorialized the circumstances she witnessed or was advised of by the St. Francis school's staff concerning Plaintiff on June 16, 2006 in

a memo entitled "Professional Conduct," that she issued to Plaintiff on June 16, 2006, a copy of which she sent to the District's Human Resources Department. *Affidavit of Joan Goudy-Crosson at ¶ 47 and Exhibit I thereto*; *Affidavit of Mary Ellen Leimer at ¶ 33 and Exhibit P thereto*.

119.  Leimer received an Educator Improvement Plan report for February 2006 to May 2006 (Plaintiff Deposition Exhibit 2) which was critical of Plaintiff, which Leimer believed had been prepared by either defendant Goudy-Crosson, Henderson, Burpee or Sobel. While admitting she might have prepared that report, defendant Goudy-Crosson does not recall that she prepared the report. *Affidavit of Mary Ellen Leimer at ¶ 34 and Exhibit Q thereto; Deposition Testimony of Mary Ellen Leimer at pages 5- 6;Deposition Testimony of Joan Goudy-Crosson at page 59* .

120.  Human Resources received a June 20, 2006 memo from Plaintiff to defendant Goudy-Crosson, in which Plaintiff disagreed with defendant Goudy-Crosson's remarks concerning the behavior of Plaintiff and her control of her class on June 16, 2006. *Affidavit of Mary Ellen Leimer at ¶ 33 and Exhibit P thereto*.

121.  Defendant Goudy-Crosson prepared two Teacher Evaluation Reports of Plaintiff for the 2005-2006 school year. Each was very critical of Plaintiff's performance, particularly as it concerned classroom management. *Affidavit of Joan Goudy-Crosson at ¶¶ 48-51 and Exhibits J, K and L thereto*.

122.  After the conclusion of the 2005-2006 school year, effective in September of 2006, Plaintiff continued in the Center Based program, teaching elementary level, which was now at a facility by Stewart Airport. *Affidavit of Mary Ellen Leimer at ¶ 35;*

*Affidavit of Patricia A. Tompkins at ¶ 14; Affidavit of Rikki Pearson at ¶ 17 .*

123.   During Plaintiff's employment at the facility by Stewart Airport, Plaintiff was observed to be having the same kind of classroom management problems that she had been observed to have while employed at St. Francis. *Affidavit of Rikki Pearson at ¶¶ 4-10 and 17; Affidavit of Patricia A. Tompkins at ¶¶ 4, 7-9 and 14; Affidavit of Joan Goudy-Crosson at ¶¶ 9-28; Affidavit of Elsie Bryant at ¶¶ 3-7; Affidavit of Wihlemena Lamb at ¶ 14; Affidavit of Carrie Frost at ¶¶ 5 and 6; Affidavit of Norma Yvette Norat at ¶¶ 6-8.*

124.   In July of 2006, Leimer became the District's Assistant Superintendent for Human Resources. *Affidavit of Mary Ellen Leimer at ¶ 1; Deposition Testimony of Mary Ellen Leimer at pages 4-5.*

125.   Leimer spoke with defendant Goudy-Crosson after the commencement of the 2006-2007 school year concerning Plaintiff's performance and before she made her recommendation to Superintendent Saturnelli concerning tenure denial for Plaintiff. During that conversation, defendant Goudy-Crosson advised Leimer, among other things, that Plaintiff had continued through the 2005-2006 school year to demonstrate serious classroom management problems as observed by herself and other staff members. *Affidavit of Mary Ellen Leimer at ¶ 37.*

126.   Based upon Plaintiff's serious performance problems at New Windsor and St. Francis, and the lack of any information indicating to Leimer that Plaintiff's performance had dramatically improved while at St. Francis, Leimer concluded that Plaintiff should not be granted tenure and was determined to provide the

Superintendent with a negative recommendation. *Affidavit of Mary Ellen Leimer at ¶ 38.*

127.   Leimer felt compelled by the Commissioner of Education's regulations at part 100.2(o) concerning professional performance reviews to only rely upon information in her possession that post-dated Plaintiff's EIP to support her recommendation and that information in documentary form was limited at that time to the June 16, 2006 memo from defendant Goudy-Crosson and the Educator Improvement Plan report for February 2006 to May 2006. *Affidavit of Mary Ellen Leimer at ¶ 38.*

128.   After speaking with defendant Goudy-Crosson, Leimer spoke with Superintendent of Schools Saturnelli about Leimer's recommendation to deny Plaintiff tenure and they discussed the limited documentary information post-EIP concerning Plaintiff. They decided that even if the limited availability of such information raised problems, they could not in good conscience recommend granting tenure to a teacher as to whom they had serious qualms as to her ability to teach or manage a classroom of elementary grade students. Consequently, they decided that the Superintendent would recommend a denial of tenure and termination of Plaintiff to be acted upon by the Board at its meeting on November 28, 2006 and Leimer prepared a letter to that effect, dated October 28, 2006, to Plaintiff for the Superintendent to sign, which was thereafter executed by Superintendent Saturnelli and sent to Plaintiff. *Affidavit of Mary Ellen Leimer at ¶ 39 and Exhibit R thereto.*

129.   Plaintiff thereafter requested the reasons for the Superintendent's decision, as was her right under the Education Law, and Leimer was tasked to prepare the response,

commonly referred to as a "reasons letter," and she did so. *Affidavit of Mary Ellen Leimer at ¶ 40 and Exhibit S thereto.*

130.   Leimer presumed that she was limited to events that occurred after the Plaintiff's EIP had issued in setting forth particulars in the reasons letter and selected post-EIP references in the documents in Human Resources' files as being emblematic of Plaintiff's performance problems that  she and the Superintendent would rely upon, i.e., the Educator Improvement Plan report for February 2006 to May 2006 to support the reason that Plaintiff failed to properly design lessons and the June 16, 2006 letter from defendant Goudy-Crosson to support the reason that Plaintiff failed to exercise appropriate classroom discipline. The letter was issued by Superintendent Saturnelli on November 13, 2006. *Affidavit of Mary Ellen Leimer at ¶ 40 and Exhibit S thereto*.

131.   Plaintiff responded to the Superintendent's reasons letter by letter of November 17, 2006. Concerning the first reason of "failing to design lessons that have clearly defined objectives for the learner or which engage students in meaningful learning," Plaintiff expressed disagreement with that conclusion and complained that the District had not complied with the EIP. Concerning the second reason of  having "failed to maintain appropriate classroom discipline, " Plaintiff  enclosed her June 20, 2006 response to the June 16, 2006 memo from defendant Goudy-Crosson. Plaintiff did not raise any complaint that the decision to terminate her employment was affected by national origin discrimination practiced either by the District, defendant Saturnelli or defendant Goudy-Crosson. *Affidavit of Mary Ellen Leimer*

*at ¶ 41 and Exhibit T thereto.*

132. By letter of November 26, 2006 to defendant Saturnelli,, upon which she copied not only her union president and Leimer, but also attorney Michael Sussman, Esq., Plaintiff further responded to the reasons letter. At the third page thereof, Plaintiff claimed that defendant Goudy-Crosson had retaliated against Plaintiff for "questioning her authority," and concluded her letter by stating that defendant Saturnelli's recommendation to the Board that she be denied tenure and terminated based on the EIP report "is unjustified and unsupported by the facts, once they are investigated." Plaintiff raised no complaint therein that the decision to terminate her employment was affected by national origin discrimination practiced either by the District, defendant Saturnelli or defendant Goudy-Crosson. *Affidavit of Mary Ellen Leimer at ¶ 42 and Exhibit U thereto.*

133. Plaintiff's letters of November 17, 2006 and November 26, 2006, as well as defendant Saturnelli's letters of October 28, 2006 and November 13, 2006, were provided to the Board in advance of the November 28, 2006 meeting at which it voted to adopt defendant Saturnelli's recommendation to deny Plaintiff tenure and terminate her employment. On November 28, 2006, the Board voted to deny the plaintiff tenure and terminate her employment effective December 31, 2006. *Affidavit of Mary Ellen Leimer at ¶ 43*

134. On or about November 16, 2006, by cover letter of that date, teachers union chairperson James Nee filed a grievance with Leimer against the District on behalf of Plaintiff, in which the union claimed that the District had violated the collective

bargaining agreement and the District's APPR (i.e., Annual Professional Performance Review as outlined in part 100.2 (o) of the Regulations of the New York Commissioner of Education) by allegedly not fulfilling the requirements of the EIP that had been established for Plaintiff.  As remedy, the union sought that Plaintiff be granted an additional year of probationary employment. *Affidavit of Mary Ellen Leimer at ¶ 44 and Exhibit V thereto.*

135.    The collective bargaining agreement between the teachers union and the District defines a grievance  at Article III §2(a) thereof as "a complaint by an employee in the bargaining unit (1) that there has been as to him/her a violation, misinterpretation or inequitable application of any of the provisions of this agreement or (2) that he has been treated unfairly or inequitably by reason of any act or condition which is contrary to established policy or practice governing or affecting employees . . . ." *Affidavit of Mary Ellen Leimer at ¶ 45 and Exhibit W thereto*.

136.    After the grievance could not be resolved, the teachers union demanded arbitration by a formal demand for arbitration dated February 15, 2007. As per the demand, the teachers union claimed that Plaintiff was terminated without being provided necessary and appropriate observations and evaluations required by the collective bargaining agreement and without being provided an EIP in accordance with the District's APPR Procedure.  The union demanded therein that the plaintiff be granted an additional (i.e.. fifth)  year of probationary employment. *Affidavit of Mary Ellen Leimer at ¶ 46 and Exhibit X thereto.*

137.    The grievance proceeded to arbitration before impartial arbitrator Bonnie Seiber

Weinstock on September 10, 2007 and, following a transcribed arbitration hearing on that day concerning the procedural arbitrability of the grievance, the union submitted a brief arguing at page 3 thereof that as school districts are mandated by the Commissioner of Education's regulations to adopt a professional development plan, "the District's compliance or noncompliance with the evaluative process under the contract and within the APPR framework is appropriately at issue in arbitration." *Affidavit of Mary Ellen Leimer at ¶ 47 and Exhibits Y and Z thereto.*

138.   On January 2, 2008,  the arbitrator rendered her award, holding that the claim that the District had violated the District's APPR as concerned the implementation of Plaintiff's EIP could go forward to a hearing on the merits (Exhibit AA hereto). However, without any explanation, the teachers union thereupon withdrew Plaintiff's grievance from arbitration (Exhibit BB hereto).  *Affidavit of Mary Ellen Leimer at ¶ 48 and Exhibits AA and BB thereto*.

139.   The District does not keep records of the national origin of its staff. *Affidavit of Mary Ellen Leimer at ¶ 49.*

140.   In *Simpson v. Enlarged Cith School District of Newburgh*, 05 Civ. 5144 (GAY), 2007 U.S.Dist LEXIS 71262 (S.D.N.Y. Sept. 26, 2007), counsel for Plaintiff herein brought an action in 2005 on behalf of Daceta Simpson in which it was claimed that she had been denied tenure and terminated from employment by the District because of her Jamaican national origin and her race. Among the witnesses identified in that case by Simpson were teacher Oneka Ellis. The District eventually filed a successful summary judgment motion and in support thereof, provided testimony by Oneka

41

Ellis that she was a Carribean (St. Thomas) American and had been granted tenure by the District in 2001 and an affidavit by District School Psychologist Guy Delisfort that he was of Haitian descent. *Affirmation of Mark C. Rushfield, Esq. at ¶ 3 and Exhibits A and B thereto; Affidavit of Mary Ellen Leimer at ¶ 51.*

141.   Guy Delisfort was granted tenure by the District in 1999. *Affidavit of Mary Ellen Leimer at ¶ 51.*

142.   Plaintiff has never filed a Notice of Claim with the District. *Affidavit of Mary Lou Botsford at ¶ 3.*

143.   Plaintiff returned to teaching full time as an elementary school teacher at the New Paltz Central School District in January of 2008. *Deposition Testimony of Plaintiff at page 500.*

144.   On April 26, 2008, Plaintiff told Dr. Winchester-Vega that her PTSD was worse than ever and that she continued to fear contact with parents of students. *Deposition Testimony of Dr. Michele Winchester-Vega at page 122.*

145.    While working as a full-time  elementary school teacher for the New Paltz Central School District between January and May of 2008, Plaintiff started getting dizzy and vomiting whenever a door slammed or a student started seriously misbehaving started and found she just couldn't perform her duties as a teacher.  *Deposition Testimony of Plaintiff at page 502.*

146.   By May 1, 2008, Plaintiff had reached the conclusion that she was unable to work as a teacher and she communicated this conclusion to her New Paltz Middle School Principal and Dr. Wincheter-Vega. *Deposition Testimony of Plaintiff at pages 501-*

*504.*

147.    On May 1, 2008, Plaintiff told Dr. Winchester-Vega that she couldn't teach anymore, that she had anxiety in checking messages, that she felt like passing out during a parent meeting, that every day was getting worse and worse, that she had gotten dizzy while walking and had to hold a railing, that she had told her Middle School principal that day (May 1, 2008) that tomorrow would be her last day and that she left her teaching position at the New Paltz Central School District feeling overwhelmed and not accepted by parents and that she couldn't take it. *Deposition Testimony of Dr. Michele Winchester-Vega at pages 124-128.*

148.    Plaintiff left her teaching position for the New Paltz Central School District on May 1, 2008 on the advice of her physician that she could not go to work because of a fear that she would faint. *Deposition Testimony of Plaintiff at page 504.*

WHEREFORE, defendants request that this Court render a summary judgment under Rule 56 of the Federal Rules of Civil Procedure dismissing the Complaint in all respects, granting judgment to the defendants and granting defendants such other and further relief as the Court may deem just and proper.

Dated: January 14, 2009                     Respectfully submitted,

                                            SHAW, PERELSON, MAY & LAMBERT, LLP
                                            Attorneys for Defendants


                                            By:_____/S/_____
                                            Mark C. Rushfield, Esq. (MCR0231)
                                            Of Counsel to the Firm
                                            21 Van Wagner Road
                                            Poughkeepsie, New York 12603
                                            845/486-4200