UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - X

ERTHA AUGUSTIN,                          :

                        Plaintiff,       :

           - against -                   :

ENLARGED CITY SCHOOL DISTRICT OF         :
NEWBURGH, DR. ANNETTE SATURNELLI, sued
in her personal capacity, and JOAN       :
GOUDY-CROSSON,
                                         :
                        Defendants.
                                         :
- - - - - - - - - - - - - - - - - - - X

07 Civ. 5709 (WCC)

**ECF CASE**

**OPINION
AND ORDER**

**A P P E A R A N C E S :**

                              SUSSMAN & WATKINS
                              **Attorneys for Plaintiff**
                              P.O. Box 1005
                              55 East Main Street, Suite 6
                              Goshen, New York 10924

CHRISTOPHER D. WATKINS, ESQ.

        Of Counsel

                              SHAW, PERELSON, MAY & LAMBERT, LLP
                              **Attorneys for Defendants**
                              21 Van Wagner Road
                              Poughkeepsie, New York 12603

MARK C. RUSHFIELD, ESQ.

        Of Counsel

**Copies E-Mailed & Faxed to Counsel of Record**

**CONNER, Senior D.J.:**

Plaintiff, Ertha Augustin, brings this action pursuant to 42 U.S.C. § 1983 and New York State Executive Law § 296 against Annette Saturnelli ("Saturnelli") and Joan Goudy-Crosson ("Goudy-Crosson") in their individual capacities and the Enlarged City School District of Newburgh (the "District," and together with Saturnelli and Goudy-Crosson, "defendants"). Plaintiff alleges that defendants terminated her employment because of her national origin, in violation of her right to equal protection as guaranteed by the Fourteenth Amendment of the United States Constitution and New York state law. Defendants now move for summary judgment. For the reasons set forth below, defendants' motion is granted in part and denied in part.

## BACKGROUND

Unless otherwise indicated, the following facts are undisputed.

## I.     The Parties

Plaintiff, a female teacher of Haitian descent, was employed by the District as a full-time probationary elementary education teacher in or about the beginning of January 2003. (Defs. R. 56.1 Stmt. ¶ 1.) Goudy-Crosson is a long-tenured administrator in the District. (*Id.* ¶ 67.) Saturnelli was the Superintendent of Schools for the District at all relevant times. (Saturnelli Aff. ¶ 1.)

## II.    Plaintiff's Experience Prior to Her Employment at West Street and St. Francis

Prior to plaintiff's full-time employment with the District, plaintiff was employed as a substitute teacher by the District. (Defs. R. 56.1 Stmt. ¶¶ 3-4; Pl. R. 56.1 Reply Stmt. ¶ 3.)

Plaintiff's work performance as a substitute teacher is in dispute: defendants contend that the District's Human Resources Department ("Human Resources") received many complaints about plaintiff and that teachers requested that plaintiff not be assigned to their classes (Defs. R. 56.1 Stmt. ¶ 5), while plaintiff contends that she was "kept busy [as] a substitute" and was frequently asked to teach at several different schools (Pl. R. 56.1 Reply Stmt. ¶ 5).

From January 2003 to June 2003, plaintiff worked as a full-time teacher at the District's Center Based program at the Calvary School for students serving suspensions from school.[1] (Defs. R. 56.1 Stmt. ¶¶ 6, 8.)  In June 2003, plaintiff was assaulted by a student and took a medical leave of absence until September 2004.  (*Id.* ¶¶ 7-8; Pl. R. 56.1 Reply Stmt. ¶¶ 7-8.)  Since plaintiff's assault, she has suffered from Post Traumatic Stress Disorder on a continuous basis and has been treated by Dr. Michele Winchester-Vega ("Winchester-Vega"), a certified social worker.  (Defs. R. 56.1 Stmt. ¶ 9 (citing Rushfield Aff'm, Tr. Excerpts (Winchester-Vega Dep. at 8-9)).)[2]

In August 2004, Winchester-Vega advised the District that plaintiff could return to work on a full-time basis and plaintiff was assigned to the New Windsor Elementary School ("New Windsor") at the start of the 2004-05 school year.  (Defs. R. 56.1 Stmt. ¶¶ 13, 17.)  Plaintiff's work performance at New Windsor is also in dispute.  Defendants contend that the Principal of New

---

[1] The Center Based program is designed to place students on suspension with other disciplined students in a small class setting where teachers, social workers and security monitors address the students' educational and emotional needs.  (Leimer Aff. ¶ 7.)

[2] To support this assertion, defendants cite the deposition testimony of plaintiff and Winchester-Vega.  (Defs. R. 56.1 Stmt. ¶ 9.)  Plaintiff objects to the use of her communications with Winchester-Vega for any purpose other than to assess damages on this motion for summary judgment, in this instance as well as in all other instances where defendants cite Winchester-Vega's deposition testimony.  (Pl. R. 56.1 Reply Stmt. ¶ 9.)  All propositions that rely on Winchester-Vega's testimony have been so designated.

Windsor, Roberto Calderin ("Calderin") and others, including the assistant principal, observed that plaintiff had "continuing serious problems with classroom management." (*Id*. ¶ 19.)  However plaintiff refutes this, citing her own testimony and directing the Court to written reports by Calderin and the assistant principal that do not reflect such a negative review of her performance. (Pl. R. 56.1 Reply Stmt. ¶ 19.)[3]  At some point at the beginning of the school year, plaintiff was assigned a mentor. (Defs. R. 56.1 Stmt. ¶ 32; Pl. R. 56.1 Reply Stmt. ¶ 32.)  The parties dispute the reason for this assignment; defendants contend that she was assigned a mentor because of the alleged problems with her work performance while plaintiff contends it was routine for a teacher in plaintiff's position to have a mentor. (Defs. R. 56.1 Stmt. ¶¶ 31-32; Pl. R. 56.1 Reply Stmt. ¶ 31.)

Calderin received complaints about plaintiff from parents of plaintiff's students; issues of fact exist regarding whether those complaints were discussed with plaintiff and plaintiff disputes the merits of the criticisms in the complaints. (*See* Defs. R. 56.1 Stmt. ¶¶ 21, 23, 25, 33, 49; Pl. R. 56.1 Reply Stmt. ¶¶ 21, 22, 23, 25, 33, 49.)  Calderin informed Mary Ellen Leimer ("Leimer"), the District's Executive Director for Human Resources "throughout all but the last months of plaintiff's employ by the District," that parents of plaintiff's students were voicing complaints about plaintiff's performance and that Calderin had similar concerns about plaintiff. (Defs. R. 56.1 Stmt. ¶ 36; Leimer Aff. ¶ 1.)[4]

_____

[3]  For example, one report states that plaintiff managed her classroom "adequately" and her performance was "satisfactory" although there was "room for improvement." (Calderin Aff., Ex. C.)

[4]  Plaintiff denies these statements as characterized on the ground that there is no contemporaneous documentation of the alleged communications between Calderin and Leimer and a reasonable jury may reject the "self-serving" testimony of these "interested" witnesses. (Pl. R. 56.1 Reply Stmt. ¶ 36.)

In December 2004, plaintiff was reassigned to her mentor's class so that, according to defendants, she could "develop and improve necessary skills." (Defs. R. 56.1 Stmt. ¶ 48.) Plaintiff contends that her mentor was openly hostile to her and that Calderin failed to intervene to address the hostility. (Pl. R. 56.1 Reply Stmt. ¶ 48.) Plaintiff believed and continues to believe that Calderin's treatment of her and the decisions he made concerning her at New Windsor were based on her race. (Defs. R. 56.1 Stmt. ¶ 51.) Plaintiff testified that, in December 2004, she called Saturnelli's office to complain that Calderin was mistreating her because she was black; she told the secretary that she was treated inhumanely and that "[she] was a victim once, they failed to protect [her], and [she] refused to be a victim again." (Rushfield Aff'm, Tr. Excerpts (Augustin Dep. at 163:14-164:10).)

Shortly after plaintiff was reassigned to her mentor's classroom, she was transferred, at her request, to the Center Based program, then located at the West Street School ("West Street"). (Defs. R. 56.1 Stmt. ¶ 58.)

### III.   Plaintiff's Employment at West Street and St. Francis

In March 2005, plaintiff commenced employment at the Center Based program at the West Street School. For the 2005-06 school year, the District's Center Based program was moved from West Street to St. Francis. (*Id*. ¶ 67.) Goudy-Crosson, who administered the Center-Based program for the 2003-04, 2004-05 and 2005-06 school years, was the building administrator and principal for St. Francis. (*Id*.)

Prior to this action, Goudy-Crosson, an African-American female, had never been accused of having a bias against any person because of his or her national origin. (*Id*. ¶ 69.) In or about

4

September 2001, while she was the principal of the District's Heritage Junior High School ("Heritage School"), Goudy-Crosson interviewed and then recommended Daceta Simpson ("Simpson") for initial hire by the District as a special education teacher at the Heritage School. (*Id*. ¶ 71.) On Goudy-Crosson's recommendation, in or about October 2001, Simpson was hired by the District and assigned to work under Goudy-Crosson at the Heritage School. (*Id*.) Simpson was Jamaican, "with a distinctive Carribean accent and dialect." (*Id*.) Subsequently, the District denied tenure to and terminated Simpson, however Goudy-Crosson played no role in this decision, as Simpson was not working in any school that Goudy-Crosson administered, nor was Simpson otherwise under Goudy-Crosson's supervision in Simpson's last few years of employment by the District. (*Id*. ¶ 72.)

Pursuant to the recommendation process in the District, Human Resources makes a recommendation about whether a teacher should be granted tenure or terminated to the Superintendent of Schools ("Superintendent"), who usually relies upon that recommendation in making her own recommendation to the District's Board of Education ("Board") without performing any independent investigation. (*Id*. ¶ 73.) If a teacher requests the reasons for an adverse recommendation by the Superintendent, Human Resources provides the Superintendent with those reasons and drafts the Superintendent's response to the teacher, which response the Superintendent is required to provide, pursuant to the Education Law. (*Id*.) This correspondence and any response by the teacher are provided to the Board for its consideration in voting on whether or not to adopt the Superintendent's recommendation. (*Id*.)

Plaintiff's initial three-year period as a full-time tenure-track teacher was to conclude on or about December 31, 2005. (*Id*. ¶ 74.) By that date, under the Education Law, the Board would have

to either grant tenure to her, based on the Superintendent's recommendation, or terminate her employment by a vote. (*Id.*)

Prior to the commencement of the 2005-06 school year, Leimer and the Assistant Superintendent for Human Resources, W. John Knight ("Knight"), decided that, in light of the limited period of time (approximately twelve months) in which plaintiff was actually functioning as a full-time teacher for the District, as well as her "troubled history" as a substitute teacher, the "serious performance problems" she demonstrated at New Windsor, as reported by Calderin, and the multiple parental complaints received about plaintiff while she worked at New Windsor, they could not recommend to the Superintendent that plaintiff be granted tenure.[5] (*Id.* ¶ 75.) According to defendants, Knight and Leimer discussed with Saturnelli a recommendation for denial of plaintiff's tenure and termination of her employment effective December 31, 2005. (*Id.* ¶ 76.) They also discussed a concern that the District had never adopted a written Educator Improvement Plan ("EIP")[6] for plaintiff and that the lack of such a plan might entitle plaintiff to a fourth year of probation before they could recommend denial of tenure and termination.[7] (*Id.*) They decided to

---

[5] Plaintiff admits the first reason - plaintiff's limited time actually working as a full-time teacher - but denies the others, citing her own deposition testimony. (Pl. R. 56.1 Reply Stmt. ¶ 75, citing Watkins Aff'm, Ex. 21 (Augustin Dep. at 267-68).) It is not clear how this testimony contradicts defendants' assertions as to the reasons Knight and Leimer decided not to recommend tenure for plaintiff.

[6] According to defendants, an EIP is prepared for a probationary teacher when a school district considers the teacher's performance to be unsatisfactory. (Defs. R. 56.1 Stmt. ¶ 57.) Plaintiff denies this characterization and states that an EIP "is supposed to be used to help a teacher improve." (Pl. R. 56.1 Reply Stmt. ¶ 57.)

[7] Plaintiff denies defendants' assertions about Knight and Leimer's discussions with Saturnelli as "self-serving testimony by interested witnesses which a jury may reject and the Court should disregard on this motion." (Pl. R. 56.1 Reply Stmt. ¶ 76.) Plaintiff also contends that these assertions conflict with Leimer's deposition testimony that the only reasons for

offer to plaintiff a fourth year of probation and to adopt an EIP for plaintiff so that the lack of an EIP would not constitute a potential impediment to a future recommendation to deny tenure to plaintiff and terminate her employment.  (*Id*. ¶ 77.)

By letter dated August 24, 2005, Leimer presented to plaintiff an extension agreement (the "agreement") prepared by counsel for the District with instructions that plaintiff must sign the agreement by August 31, 2005.  (*Id*. ¶ 78.)  According to defendants, plaintiff avoided signing the agreement by the stated deadline and Leimer instructed Goudy-Crosson on more than one occasion at the beginning of the school year to direct plaintiff to contact Leimer concerning the unexecuted agreement; Goudy-Crosson did as she was instructed.  (*Id*. ¶¶ 79-80.)  Plaintiff explains that when she received the agreement, she noticed an error "regarding the date," about which she told Leimer, and that she did not "avoid" signing the agreement but waited to sign it until the error was corrected. (Augustin Aff. ¶ 7.)   Leimer, Saturnelli and Knight had agreed among themselves that if plaintiff did not execute the agreement, the Superintendent would recommend that plaintiff be denied tenure and terminated, effective no later than December 31, 2005.[8]  (Defs. R. 56.1 Stmt. ¶ 81.)

On September 8, 2005, plaintiff and Goudy-Crosson had a discussion concerning the need

---

plaintiff's subsequent termination were stated in a letter plaintiff was provided explaining why Saturnelli recommended her termination. (*Id*.)  The "reasons" letter cites plaintiff's alleged failure to design proper lessons and failure to maintain appropriate classroom discipline. (Leimer Aff., Ex. S.)  Plaintiff also contends that these assertions conflict with Leimer's testimony that the decision to terminate plaintiff was based substantially on Goudy-Crosson's feedback.  (Pl. R. 56.1 Reply Stmt. ¶ 76.)

[8] Plaintiff denies this statement as characterized on the ground that the evidence cited does not support the statement.  (Pl. R. 56.1 Reply Stmt. ¶ 81.)  It appears that while defendants, in their Rule 56.1 Statement, cited the Leimer Affidavit, ¶ 25, which paragraph does not support this statement, defendants must have meant to cite the Leimer Affidavit, ¶ 26, which does support the statement.

for plaintiff to contact Leimer about the agreement.  (*Id.* ¶ 82.)  According to defendants, during that conversation, Goudy-Crosson told plaintiff that she was simply giving plaintiff "the directive to contact Leimer that [] Goudy-Crosson had received from Leimer" and in response, plaintiff stated "I may be an immigrant, but I'm not stupid."  (*Id.*)  According to Goudy-Crosson, plaintiff's statement -- "I may be an immigrant, but I'm not stupid" -- was the only time that the term "immigrant" was stated by either plaintiff or Goudy-Crosson during any conversation between them, and Goudy-Crosson responded to it by stating: "'Ms. Augustin, I am not the enemy here, I am relaying a directive to you from my supervisor.'"  (*Id.* ¶¶ 83-84.)  However, plaintiff testified that she commented on her immigrant status and intelligence in response to a comment that Goudy-Crosson made to her, while the two were in Goudy-Crosson's office, that Goudy-Crosson did not want an "immigrant" in plaintiff's classroom and preferred to have someone named Jon Hunt in the classroom, an individual who had taught in that classroom in the past (the "immigrant remark"). (Watkins Aff'm, Ex. 21 (Augustin Dep. at 315-16, 322-23).)[9]

In a "Letter of Critical Evaluation" to plaintiff, dated November 2, 2005, Goudy-Crosson cited her interaction with plaintiff wherein plaintiff's status as an immigrant was mentioned and admonished plaintiff that her statement was "inappropriate, argumentative and unprofessional." (Defs. R. 56.1 Stmt. ¶ 82; Goudy-Crosson Aff., Ex. F.)  By memo dated November 14, 2005, plaintiff responded: "the discussion where I made a comment about my immigrant status and level of intelligence was in response to an incorrect date on the tenure extension letter which was

---

[9] Plaintiff testified: "[Goudy-Crosson] mentioned that she - - I don't remember what exactly but something to the effect as Jon Hunt for the classroom and she didn't want an immigrant."  (Watkins Aff'm, Ex. 21 (Augustin Dep. at 322:18-22).)  Plaintiff also testified that Goudy-Crosson "said . . . she wanted Jon Hunt in the elementary level, not an immigrant."  (*Id.* at 340:3-5).)

subsequently changed." (Defs. R. 56.1 Stmt. ¶ 87; Goudy-Crosson Aff., Ex. G.)

According to defendants, from September 2005 through the 2005-06 school year, plaintiff had "observable serious classroom management problems in controlling her students at St. Francis and in getting them to do the schoolwork assigned by their originating schools." (Defs. R. 56.1 Reply Stmt. ¶ 92.) Plaintiff denies this, stating that she did not have difficulty controlling her students or having them complete their assigned work. (Pl. R. 56.1 Reply Stmt. ¶ 92.) She also notes that, even though she was only "supposed to be" teaching elementary students, Goudy-Crosson often sent to her class junior high school and special education students who were not doing their work in other teachers' classes at St. Francis. (Augustin Aff. ¶ 8.) According to defendants, Goudy-Crosson, because of plaintiff's alleged classroom management problems, established a rule that plaintiff was never to be in a classroom alone with her students and she set up a security post for the school monitors outside plaintiff's classroom in the event that any serious classroom management problems arose. (Defs. R. 56.1 Stmt. ¶¶ 93, 95.) Plaintiff denies this and explains that a teacher's assistant and a security guard were assigned to her classroom as a matter of course because she taught students in seven different grades in one classroom and that the same arrangements had been made for the classroom of an elementary school teacher at the Center Based program at West Street. (Pl. Rule 56.1 Reply Stmt. ¶¶ 93, 95; Augustin Aff. ¶ 9.) Plaintiff also states that there were many occasions during the school year when she was left alone in the classroom. (Augustin Aff. ¶ 9.)

On October 31, 2005 Goudy-Crosson observed plaintiff's classroom. (Defs. R. 56.1 Stmt. ¶ 100.) According to plaintiff, Goudy-Crosson had initially planned to observe her on October 27, 2005, but Goudy-Crosson "did not show up for the scheduled observation" and informed plaintiff that she would observe plaintiff on the next day; however on October 28, 2005, Goudy-Crosson

again failed to appear.  (Pl. R. 56.1 Counterstmt. ¶¶ 7-10)[10]  Goudy-Crosson then "appeared in plaintiff's classroom on . . . October 31, and stayed for only fifteen minutes."  (*Id.* ¶ 11.)[11]  Crosson then issued to plaintiff a "Letter of Critical Evaluation," dated November 2, 2005, raising various concerns about plaintiff's job performance.  (Goudy-Crosson Aff., Ex. F.)  The letter states that, on October 27, 2005, plaintiff asked Goudy-Crosson about grounds for removing a student from class; in the course of this conversation, plaintiff stated "Mrs. [Goudy-]Crosson you are treating me unfairly and are discriminating against me" and Goudy-Crosson cautioned plaintiff to be "very careful with the manner in which you speak to me."  (*Id.* at 2.)  Plaintiff responded to Goudy-Crosson's Letter of Critical Evaluation in a memo, dated November 14, 2005.  (*Id.*, Ex. G.)

On December 1, 2005, plaintiff and her union representative met with Goudy-Crosson and Leimer.  (Pl. R. 56.1 Counterstmt. ¶ 19.)  Plaintiff testified that at the meeting the participants discussed, among other things, the fact that Goudy-Crosson had indicated that plaintiff was inferior to her.  (Watkins Aff'm, Ex. 21 (Augustin Dep. at 347:11-23).)  Leimer denies that anyone at the meeting claimed that Goudy-Crosson had said that plaintiff was inferior to Goudy-Crosson or anyone else.  (Leimer Reply Aff. ¶ 28.)

On December 14, 2005, Goudy-Crosson performed a second classroom observation of plaintiff.  (Pl. R. 56.1 Counterstmt. ¶ 21.)  Plaintiff testified that at a post-observation conference, Goudy-Crosson told her that although plaintiff mistakenly used the word "floor" instead of "ground,"

---

[10] Defendants object on the ground that plaintiff relies on a hearsay allegation contained in an unsworn letter of plaintiff's which is unsupported by any sworn statement.  (Defs. R. 56.1 Reply Stmt. ¶¶ 7-10.)

[11] Defendants object on the ground that plaintiff relies on a hearsay allegation contained in an unsworn letter of plaintiff's which is unsupported by any sworn statement.  (Defs. R. 56.1 Reply Stmt. ¶ 11.)

Goudy-Crosson had "actually witnessed an almost perfect observation in my room" and she "went into detail about the lesson and mentioned how everything was excellent." (Watkins Aff'm, Ex. 21 (Augustin Dep. at 415:8-24).)   However, an Observation Report, dated December 14, 2005, containing Goudy-Crosson's initials but not signed by plaintiff, states that although it was obvious that plaintiff "put a lot of effort into planning the lesson" and plaintiff was patient with the students, the "lesson objective" was never made known to the students, the lesson contained too many objectives, and it was unclear whether the students understood the lesson. (Watkins Aff'm, Ex. 15.) Plaintiff testified that she first saw this report after she was no longer employed by the District. (Watkins Aff'm, Ex. 21 (Augustin Dep. at 413:15-414:14).)   Goudy-Crosson testified that she showed the report to plaintiff and asked her to sign it at the post-observation conference but that plaintiff did not sign it. (*Id.*, Ex. 22 (Goudy-Crosson Dep. at 35:20-36:3).) Goudy-Crosson further testified that she made a written request that plaintiff sign the report, but defendants have not produced any such document to plaintiff in discovery. (*Id.* at 36:4-6; Watkins Aff'm ¶ 2.)

### A.   <u>Plaintiff's EIP</u>

Defendants contend that, commencing in or about October 2005 through January 2006, Goudy-Crosson, Leimer, plaintiff and her union representative, Philip Cordella, met on a weekly basis to formulate an EIP for plaintiff and, at those meetings, Goudy-Crosson would comment on what she had observed of plaintiff's performance and where improvement was needed. (Defs. R. 56.1 Stmt. ¶ 96.) Plaintiff denies this and states that a meeting was held in late November or early December 2005 and there were no weekly meetings after that. (Pl. R. 56.1 Reply Stmt. ¶ 96; Augustin Aff. ¶ 11.) According to defendants, the EIP underwent multiple drafts between October

11

2005 and January 31, 2006 because of objections communicated by plaintiff's union representative and portions of the EIP were implemented before it was finalized. (Defs. R. 56.1 Reply Stmt. ¶ 97.) Plaintiff denies this and explains that the first draft of the EIP was made in December 2005 and the final draft went into effect on February 1, 2006. (Pl. R. 56.1 Reply Stmt. ¶ 97; Augustin Aff. ¶ 11.) According to defendants, during discussions concerning the EIP, plaintiff stated that she did not need either an EIP or any other help and that there was nothing deficient in her performance as a teacher at St. Francis. (Defs. R. 56.1 Stmt. ¶ 98.) Plaintiff, however, denies that she made such statements, although she avers that she made certain suggestions so that the plan would "actually be helpful, rather than just a formality." (Pl. R. 56.1 Stmt. ¶ 98; Augustin Aff. ¶ 12.) According to defendants, the final EIP was never agreed-to by plaintiff or her union and the District issued it unilaterally on January 31, 2006 after agreement could not be reached. (Defs. R. 56.1 Stmt. ¶ 99.) Plaintiff testifies that she did agree to the EIP. (Watkins Aff'm, Ex. 21 (Augustin Dep. at 392:22-24).) The EIP covered the period February 1, 2006 through May 5, 2006. (Pl. R. 56.1 Counterstmt. ¶ 28.) According to Leimer, the purpose of the EIP was "[t]o attempt to see improvement in [plaintiff]'s performance in regard to the areas indicated." (Watkins Aff'm, Ex. 23 (Leimer Dep. at 11:25-12:5).)

The EIP provided for formal observations by the principal and by "Mrs. Henderson, or Mrs. Sobel or Mrs. Burpee" ("Henderson," "Sobel," and "Burpee").[12] (Leimer Aff., Ex. M.) One observation was to be performed "prior to 2/15/06," a second observation was to be performed "by 3/15/06 " and a third observation was to be performed "by 4/15/06." (*Id.*) According to Leimer, this could be interpreted so as to require only a single observation to be performed by Goudy-Crosson

---

[12] Margaret Burpee was the District's Director of Reading and English Language Arts. (Defs. R. 56.1 Stmt. ¶ 56.)

prior to February 15, 2006 with the other observations to be performed by Henderson, Sobel or Burpee although "in [her] mind this is not what the EIP intended." (*Id*. ¶ 30.)

According to defendants, Goudy-Crosson was never given any instructions or directions as to what she was to do concerning the EIP and the District's administration never advised her that she had any further obligation concerning formal observations of plaintiff beyond those she performed in October and December of 2005. (Defs. R. 56.1 Stmt. ¶ 102.)  However, Goudy-Crosson did receive a document from Leimer prior to the EIP meetings that instructed Goudy-Crosson to "determine the evidence or tool" to be used to measure plaintiff's success under the EIP and provided that the "evaluation" section of the plan "must include: the time, who will do it, and what it will be: i.e.: meetings, spot visits, formal observations, etc.  You may want Mrs. Henderson or Mrs. Sobel to do an observation as well." (Pl. R. 56.1 Stmt. ¶ 102; Watkins Aff'm, Ex. 20.) Leimer testified that Goudy-Crosson was involved in discussions with her about how plaintiff would be evaluated under the EIP.  (Watkins Aff'm, (Leimer Dep. at 17:22-18:18).)

Goudy-Crosson testified that she presumed that the two observations that she performed, on October 31, 2005 and December 14, 2005, met the requirements set forth in the EIP for formal observations by her as the principal because, under the collective bargaining agreement between the teachers union and the District, this was all that plaintiff was "entitled" to receive and because the initial drafts of the EIP provided that the first two formal classroom observations should be completed by December 15, 2005 and January 15, 2006. (Defs. R. 56.1 Stmt. ¶ 103.) Plaintiff denies this "as patently unbelievable," pointing out that the EIP states that it covers February 1, 2006 to May 5, 2006, and that "it defies belief that [Goudy-Crosson] actually thought that observations she had performed before the EIP went into effect could serve as measurement tools for plaintiff's

progress under the EIP."  (Pl. R. 56.1 Reply Stmt. ¶ 103.)

Although the EIP provided that Henderson, Sobel and Burpee could also observe plaintiff, no one told Goudy-Crosson that she should arrange these observations and Human Resources failed to follow-up to make sure that these observations were performed; these observations were never performed.  (Defs. R. 56.1 Stmt. ¶ 104.)  Goudy-Crosson did not have the sole and ultimate responsibility for ensuring that the observations called for in plaintiff's EIP were performed; that responsibility was shared by Goudy-Crosson with Henderson, Sobel and Burpee, each of whom were of a higher administrative level than was Goudy-Crosson.  (*Id.* ¶ 105.)[13]

Defendants note that, although under the "Designing Coherent Instruction" section of the EIP, the EIP provided for *formal* observations by Goudy-Crosson and Henderson, Sobel or Burpee, under other sections of the EIP, including the "Managing Classroom Procedures" section, the EIP states only "[o]bservation by the Principal."  (*Id.* ¶ 107; Leimer Aff., Ex. M.)  Defendants explain that the "[o]bservation by the Principal" reference was not for a formal observation but "to what defendant Goudy-Crosson would observe of [p]laintiff in different locations throughout the school."  (Defs. R. 56.1 Stmt. ¶ 107.)  According to plaintiff, no observations of her classroom, either formal or informal, occurred during the EIP time period.  (Pl. R. 56.1 Reply Stmt. ¶ 107.)  Under the section of the EIP regarding "Managing Classroom Procedures," for which the specified "timeline" was "Meeting with the Principal twice before April 30, 2006," Leimer understood that Goudy-Crosson would be meeting with plaintiff to discuss plaintiff's progress or deficiencies with respect to the management of classroom procedures.  (Defs. R. 56.1 Stmt. ¶ 108.)  According to defendants,

---

[13] Plaintiff denies these statements and makes various citations to the record, however, none of those citations contradict defendants' statements.  (Pl. R. 56.1 Stmt. ¶¶ 104-05.)

Goudy-Crosson met with plaintiff informally "at different times" between February 1, 2006 and May 5, 2006. (*Id*. ¶ 109.) Plaintiff, citing her own sworn statement, denies that Goudy-Crosson had any meetings with her about any aspect of the EIP. (Pl. R. 56.1 Reply Stmt. ¶ 109.)

### B.    The June 16, 2006 Incident

According to defendants, on June 16, 2006, plaintiff informed Goudy-Crosson, who was on her way to a meeting, that "a student had called [plaintiff] names using curse language." (Defs. R. 56.1 Stmt. ¶ 115.) Goudy-Crosson directed a school social worker to intervene; when she returned from her meeting, staff members informed her that plaintiff had "lost it" and had left her classroom screaming loudly in the hallway "get her out of my damn room. Either she goes or I go." (*Id*.) The school's security officers told Goudy-Crosson that they had asked plaintiff to lower her voice and refrain from cursing out loud and plaintiff replied that she had not been cursing. (*Id*.) Plaintiff denies this account; in a memo to Goudy-Crosson, dated June 20, 2006, plaintiff explained that when the student started cursing at her there was no security available in her area to assist her, that the social worker did not come to plaintiff's assistance until more than four hours had elapsed, and that the student began throwing objects at other students and so plaintiff stepped outside her door and called for help in a deliberately loud voice. (Pl. R. 56.1 Stmt. ¶ 115; Watkins Aff'm, Ex. 16.) Plaintiff then told the security guard, who eventually arrived, to remove the student from her classroom; although the security guard accused her of cursing, she denies this. (Pl. R. 56.1 Stmt. ¶ 115; Watkins Aff'm, Ex. 16.)

According to defendants, Goudy-Crosson then entered plaintiff's classroom and discovered plaintiff telling her students that "this Father's Day project is not working," to which students

responded by moaning, and Goudy-Crosson also observed that: (1) one of the students had his head down on his desk, another was standing next to his chair and two were talking to each other; (2) no lesson seemed to be in progress; (3) plaintiff stated "I'm passing out paper, you have two minutes to finish" without giving any further directions to the students; (4) one student complained that the work was "of to [sic] high a grade level for him"; and (4) the words "June 14 is flag day" were written on the blackboard, even though that day had passed.  (Defs. R. 56.1 Stmt. ¶ 117.)  Plaintiff denies this; she admits that her classroom was "in turmoil" because she did not receive the appropriate support and needed to leave to call the parent of the misbehaving student at Goudy-Crosson's direction.  (Pl. R. 56.1 Reply Stmt. ¶ 117; Watkins Aff'm, Ex. 16 at 2.)  She also explains that the student who complained about the work level had actually said "I don't wanna do this" in response to an assignment from his regular classroom teacher and, regarding the two children talking to each other, one was helping the other with an assignment.  (Watkins Aff'm, Ex. 16 at 2.)  When plaintiff re-entered the classroom and observed the students' behavior, she announced that the project was not working and handed the students other work to do.  (*Id.*)  Plaintiff explains that "June 14 is flag day" was written on the blackboard because there was students' work displayed under that banner.  (*Id.*)

Goudy-Crosson memorialized these events, as apparently she had witnessed them or was advised of them by St. Francis staff, in a memo issued to plaintiff on June 16, 2006, a copy of which was sent to Human Resources.  (Defs. R. 56.1 Stmt. ¶ 118.)

C.    **Reports About Plaintiff's Job Performance**

At some point, Goudy-Crosson prepared two Teacher Evaluation Reports of plaintiff for the

16

2005-06 school year, one covering September 2005 through January 2006, and one covering January 2006 through June 2006; each was critical of plaintiff's performance, particularly as it concerned classroom management.  (Defs. R. 56.1 Stmt. ¶ 121; Goudy-Crosson Aff., Exs. K, L.)  Plaintiff testified that Goudy-Crosson did not share either report with her and that the first time she saw the reports was after her employment with the District had ended.  (Watkins Aff'm, Ex. 21 (Augustin Dep. at 430:19-431:9, 450:21-451:3).)

Furthermore, at some point a document entitled "Educator Improvement Plan: February 2006 - May 2006 " was created, purportedly containing a review of plaintiff's job performance "while under the EIP" (the "EIP Summary Report").  (Leimer Aff., Ex. Q.)  The report critiques plaintiff's ability to design coherent instruction, classroom management and attempts to get along with colleagues and supervisors, although it does not critique her lesson planning.  (*Id.*)  It makes reference to Goudy-Crosson's observations of October 31, 2005 and December 14, 2005, however, the identity of the author of the report is in dispute: Goudy-Crosson testified that she could not recall creating the document but stated that she "could have" prepared it (Watkins Aff'm, Ex. 22 (Goudy-Crosson Dep. at 59:6-22)) and Leimer testified that it could have been prepared by Goudy-Crosson, Hendersen, Burpee or Sobel (Watkins Aff'm, Ex. 23 (Leimer Dep. at 5:21-6:6)).  Plaintiff did not see the report until the next semester when she reviewed her personnel file and found the document therein.  (Pl. R. 56.1 Counterstmt. ¶ 43.)

In a letter dated November 13, 2007, Marisol Riverol, plaintiff's mentor for the 2005-06 school year, provided a positive review of plaintiff's job performance, noting that plaintiff was "very receptive and enthusiastic about our meetings and discussions," that plaintiff "quickly implemented our agreed upon goals" and that plaintiff ran her classroom "smoothly, . . . using just the right mix

of humor and strong discipline." (*Id*. ¶¶ 53-54.)[14]


IV.    **Plaintiff is Denied Tenure and Her Employment is Terminated**

After the conclusion of the 2005-06 school year, plaintiff continued teaching elementary level students in the Center Based program, which, in September 2006 was then based at a facility "by Stewart Airport." (Defs. R. 56.1 Stmt. ¶ 122.)   According to defendants, during plaintiff's employment at this facility, various individuals, including her teacher's aide and a secretary to the program's administrator, observed her displaying the same kind of classroom management problems that she had exhibited during her employment at St. Francis. (*Id*. ¶ 123.) Dr. Patricia O'Connor ("O'Connor"), Deputy Superintendent of the District, was the acting principal at the time. (Watkins Aff'm, Ex. 23 (Leimer Dep. 34:8-11).)   In a letter dated October 31, 2007, O'Connor stated that plaintiff, during her employment at the Center Based program, "was supportive and patient with her students" and her students "responded to her in a reciprocal manner"; that her "classroom environment was reflective of the multiple academic and behavioral needs of the students" and that plaintiff met the challenge of working in such an environment "on a daily basis." (Pl. R. 56.1 Reply Stmt. ¶ 123; Watkins Aff'm, Ex. 19.)[15]

In July 2006, Leimer became the District's Assistant Superintendent for Human Resources. (Defs. R. 56.1 Stmt. ¶ 124.)   By letter dated October 28, 2006, prepared by Leimer and signed by

---

[14] Defendants object, asserting that these "hearsay allegation[s], contained in an unsworn letter purportedly issued by Marisol Riverol[,] . . . confirmed neither by testimony nor affidavit, [are] unsupported by any sworn statement." (Defs. R. 56.1 Reply Stmt. ¶¶ 53-54.)

[15] Defendants object, stating that the contents of this letter are hearsay allegations, that the letter was written outside of O'Connor's scope of duties as deputy Superintendent, and is "unsupported by any sworn statement." (Defs. R. 56.1 Reply Stmt. ¶ 59.)

Saturnelli, plaintiff was informed that Saturnelli, as Superintendent, would recommend a denial of tenure and termination of plaintiff to be acted upon by the Board at its meeting on November 28, 2006. (*Id*. ¶ 128.)[16]  Plaintiff requested the reasons for the Superintendent's decision and Leimer prepared a response in what is "commonly referred to" as a "reasons letter" to plaintiff, dated November 13, 2006 (the "Reasons Letter"). (Defs. R. 56.1 Stmt. ¶ 129.)

According to Leimer's affidavit, at some point after the commencement of the 2006 school year and before Leimer made her recommendation to the Superintendent, Leimer spoke with Goudy-Crosson concerning plaintiff's performance and Goudy-Crosson advised Leimer that plaintiff had continued to demonstrate serious classroom management problems during the 2005-06 school year. (*Id*. ¶ 125.)  However, Leimer testified in her deposition that she never spoke with Goudy-Crosson about plaintiff's ability to manage classroom procedures at any time after Leimer saw the EIP Summary Report.  (Watkins Aff'm, Ex. 23 (Leimer Dep. 21:21-22:6).)  According to Leimer's affidavit, she concluded that plaintiff should not be granted tenure and was "determined to provide the Superintendent with a negative recommendation" because of plaintiff's "serious performance problems at New Windsor and St. Francis, and the lack of any information indicating to Leimer that [p]laintiff's performance had dramatically improved while at St. Francis."  (Defs. R. 56.1 Stmt. ¶ 126.)  However, Leimer testified that the Reasons Letter included all of the reasons for plaintiff's termination, as was the District's custom and practice with regard to the contents of such letters, and plaintiff's Reasons Letter stated only that: (1) plaintiff had "failed to design lessons that have clearly defined objectives for the learner or which engage students in meaningful learning," citing the EIP

---

[16] Plaintiff denies this account, which relies on the sworn statements of Leimer, as "self-serving testimony by interested witnesses which a reasonable jury may disregard."  (Pl. R. 56.1 Reply Stmt. ¶ 128.)

Summary Report, and (2) plaintiff "failed to maintain appropriate classroom discipline," citing the Memo from Goudy-Crosson, dated June 16, 2006.  (Pl. R. 56.1 Reply Stmt. ¶ 126; Leimer Aff., Ex. S; Watkins Aff'm, Ex. 23 (Leimer Dep. 7:18-8:21).)  Leimer explains that she felt compelled by the Commissioner of Education's regulations concerning professional performance reviews to rely only on information in her possession that post-dated plaintiff's EIP to support her recommendation to the Superintendent; the information in documentary form at the time was limited to the June 16, 2006 memo from Goudy-Crosson and the EIP report covering February 2006 through May 2006. (Defs. R. 56.1 Stmt. ¶ 127.)[17]

After Leimer spoke to Goudy-Crosson, she then spoke with Saturnelli about recommending to deny tenure to plaintiff and they discussed the limited availability of post-EIP documentary information concerning plaintiff.  (*Id*. ¶ 128.)  They decided that even if the limited availability of such information "raised problems," they could not "in good conscience" recommend granting tenure to a teacher as to whom they had "serious qualms" regarding her ability to teach or manage a classroom of elementary grade students.  (*Id*.)  Consequently, they decided that the Superintendent would recommend a denial of tenure and termination of plaintiff's employment.  (*Id*.)[18]

Plaintiff responded to the Reasons Letter by a letter to Saturnelli, dated November 17, 2006, wherein she disagreed with the Reasons Letter's conclusion. (*Id*. ¶ 131; Leimer Aff., Ex. T.)  In response to the first reason provided -- that plaintiff had "failed to design lessons that have clearly

---

[17] Leimer selected post-EIP references in the documents in Human Resources' files that she believed to be "emblematic of [p]laintiff's performance problems."  (Defs. R. 56.1 Stmt. ¶ 130.)

[18] Plaintiff denies this account, which relies on the sworn statements of Leimer, as "self-serving testimony by interested witnesses which a reasonable jury may disregard."  (Pl. R. 56.1 Reply Stmt. ¶ 128.)

defined objectives for the learner or which engage students in meaningful learning"-- plaintiff responded that she never received the EIP Summary Report, which was the document cited in support of the reason, that she would respond to this document in a separate letter and that the Board should not consider anything in the document until plaintiff had submitted a response. (Leimer Aff., Ex. T.)  In response to the second reason provided -- that plaintiff had "failed to maintain appropriate classroom discipline" -- plaintiff enclosed her June 20, 2006 response to the June 16, 2006 memo from Goudy-Crosson.  (*Id.*, Exs. S, T.)  Plaintiff did not suggest, in her November 17, 2006 letter, that the decision to terminate her employment was affected by national-origin discrimination on the part of any of defendants.  (Defs. R. 56.1 Stmt. ¶ 131.)

On November 26, 2006, plaintiff sent a second letter addressed to Saturnelli in response to the Reasons Letter, wherein plaintiff states that she is "troubled" by the "content and tone" of the EIP Summary Report.  (*Id*. ¶ 132; Leimer Aff., Ex. U.)  Among other things, plaintiff suggests that Goudy-Crosson's criticism of planitiff's ability to handle her classroom on June 16, 2006 was made in retaliation against plaintiff after plaintiff, on June 15, 2006, sought Leimer's intervention because Goudy-Crosson refused plaintiff's request for a "mentor day." (Leimer Aff., Ex. U.)  Plaintiff noted that "[w]hile the report purports to cover the period February 2006 - May 2006, the observations and events referenced in the text are, for the most part, outside that time frame."  (*Id.*)  Plaintiff concluded the letter by stating that she believes that Saturnelli's recommendation that she be denied tenure and terminated "based on the above referenced EIP [Summary] Report is unjustified and unsupported by the facts, once they are investigated."  (*Id.*)  Plaintiff did not suggest, in this letter, that the decision to terminate her was affected by national origin discrimination.  (Defs. R. 56.1 Stmt. ¶ 132.)  Leimer testified that Saturnelli told her that she was "disturbed over the fact that there

weren't any observations" during the EIP time period but Leimer did not think Saturnelli took any action in response to this issue. (Watkins Aff'm, Ex. 23 (Leimer Dep. at 13:21-14:10).)

At a meeting on November 28, 2006, the Board voted to adopt Saturnelli's recommendation to deny plaintiff tenure and terminate her employment, effective December 31, 2006. (Defs. R. 56.1 Stmt. ¶ 133.) Saturnelli's letters of October 28, 2006 and November 13, 2006 and plaintiff's letters of November 17, 2006 and November 26, 2006 were provided to the Board in advance of the meeting. (*Id*.) Leimer testified that "it would be fair to say" that the District's termination of plaintiff was based "in substantial part" on the feedback given by Goudy-Crosson about plaintiff. (Watkins Aff'm, Ex. 23 (Leimer Dep. at 27:7-10).)

In June 2007, plaintiff filed the instant lawsuit. She alleges that defendants violated her right to equal protection, as guaranteed by the Fourteenth Amendment and section 296 of the New York State Executive Law by discriminating against her on the basis of her national origin when they denied her tenure and terminated her employment. (Complt. ¶¶ 37-38.) Plaintiff has never filed a notice of claim with the District. (Defs. R. 56.1 Stmt. ¶ 142.)

The District does not keep records of the national origin of its staff. (*Id*. ¶ 139.) Oneka Ellis, a Carribean American teacher in the District, was granted tenure by the District in 2001. (*Id*. ¶ 140.) Guy Delisfort, a School Psychologist in the District of Haitian descent, was granted tenure by the District in 1999. (*Id*. ¶¶ 140-41.)

## V.   **Plaintiff Returns to Teaching**

In January 2008, plaintiff returned to teaching full time as an elementary school teacher at the New Paltz Central School District. (Defs. R. 56.1 Stmt. ¶ 143.) While working at the New Paltz

School Central School District between January and May of 2008, plaintiff would get dizzy and vomit whenever a door slammed or a student started "seriously misbehaving" and plaintiff found that she could not perform her duties as a teacher. (*Id.* ¶ 145.) On May 1, 2008 plaintiff left her teaching position on the advice of her physician that she could not work because of a risk that she might faint. (*Id.* ¶ 148.) In August 2008, plaintiff began to look for employment again "on the advice of her doctor." (Pl. R. 56.1 Reply Stmt. ¶ 148.)

## DISCUSSION

### I.   <u>Legal Standard</u>

Summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247-50 (1986). A fact is material only if, based on that fact, a reasonable jury could find in favor of the nonmoving party. *Anderson*, 477 U.S. at 248. The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding whether summary judgment is appropriate, the Court resolves all ambiguities and draws all permissible factual inferences against the movant. *See Anderson*, 477 U.S. at 255. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nevertheless, as one court explained:

> [S]ummary judgment must be granted against a party in instances
> when such party fails to adequately establish an essential element on
> which it bears the burden of proof. . . .  The non-moving party may
> not rest upon unsubstantiated allegations, conclusory assertions or
> mere denials of the adverse party's pleading, but must set forth and
> establish specific facts showing that there is a genuine issue for trial.
> . . .  A metaphysical or other whimsical doubt concerning a material
> fact does not establish a genuine issue necessitating a trial. . . .  The
> mere existence of a scintilla of evidence supporting the non-movant's
> case is insufficient to defeat a motion for summary judgment.

*Brooks v. Di Fasi*, 1997 WL 436750, at *2 (W.D.N.Y. July 30, 1997) (internal quotation marks and

citations omitted).

While summary judgment must be granted with caution in employment discrimination

actions, it "remains available to reject discrimination claims in cases lacking genuine issues of

material fact."  *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994).  Thus, "even in

the discrimination context, a plaintiff must provide more than conclusory allegations of

discrimination to defeat a motion for summary judgment."  *Schwapp v. Town of Avon*, 118 F.3d 106,

110 (2d Cir. 1997); *see also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d

Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements

or on contentions that the affidavits supporting the motion are not credible.").


## II.   <u>Section 1983 Claim Against Goudy-Crosson</u>

Title 42 U.S.C. § 1983 provides, in relevant part: "[e]very person who, under color of [state

law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation

of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the

party injured."  "In order to establish individual liability under § 1983, a plaintiff must show (a) that

24

the defendant is a 'person' acting 'under the color of state law,' and (b) that the defendant caused the plaintiff to be deprived of a federal right." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004).  Furthermore, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977).  Defendants admit that each of the individual defendants' actions with respect to plaintiff were taken "under color of state law."  (Defs. Mem. Supp. Summ. J. at 8.)  Goudy-Crosson was also "personally involved" in the purported deprivation of plaintiff's rights when she provided negative reports and evaluations of plaintiff that the Board relied upon in voting to terminate plaintiff's employment, including the June 16, 2006 memo and possibly the EIP Summary Report, both of which were cited in the Reasons Letter.[19]  *See Back*, 365 F.3d at 123 (finding personal involvement where school principal and other administrator recommended against plaintiff's tenure and evaluated her negatively).

### A.     Deprivation of Federal Right

We turn now to whether plaintiff suffered a deprivation of a federal right.  Discrimination claims brought under § 1983 are analyzed under the *McDonnell Douglas* burden-shifting framework. *Back*, 365 F.3d at 123, citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Sorlucco v. N.Y. City Police Dep't*, 888 F.2d 4, 7 (2d Cir. 1989).  Under this framework, the plaintiff must first

---

[19] Goudy-Crosson cannot recall whether she prepared the EIP Summary Report, however, the report relies on observations of plaintiff made by her and she had knowledge of the information contained within the report, while there is no evidence that the other three potential authors of the report did.  A reasonable jury could infer that Goudy-Crosson prepared the report. Although this is an issue of fact, we must draw all inferences and view the evidence in the light most favorable to the non-moving party, here plaintiff, and we assume, for purposes of this motion only, that Goudy-Crosson did author that report.

make out a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. A plaintiff

sets forth a *prima facie* case by establishing that: (1) she belonged to a protected class; (2) she is

qualified for the position that she held; (3) she suffered an adverse employment action; and (4) the

adverse employment action gave rise to an inference of discrimination. *Mathirampuzha v. Potter*,

548 F.3d 70, 78 (2d Cir. 2008). At the summary judgment stage, under the *McDonnell Douglas*

framework, plaintiff's burden on her *prima facie* case is *de minimus*. *Dister v. Cont'l Group, Inc.*,

859 F.2d 1108, 1114 (2d Cir. 1988).

   If a plaintiff sets forth a *prima facie* case of discrimination, a presumption of discrimination

arises and the burden of production shifts to the defendants to articulate a legitimate, non-

discriminatory basis for its actions. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254

(1981); *McDonnell Douglas*, 411 U.S. at 802. However, "[t]he ultimate burden of persuading the

trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times

with the plaintiff." *Burdine*, 450 U.S. at 253. Therefore, if the defendants carry their burden of

production, then the presumption of discrimination raised by the plaintiff's *prima facie* case is

rebutted and the plaintiff must establish, by a preponderance of the evidence, that the defendants'

proffered, non-discriminatory rationale is merely a pretext for discrimination. *Id*. "[T]he plaintiff

is not required to show that the employer's proffered reasons were false or played no role in the

employment decision, but only that they were not the only reasons and that the prohibited factor was

at least one of the 'motivating' factors." *Back*, 365 F.3d at 123 (internal quotation marks and citation

omitted). The plaintiff may rely upon the same evidence that comprised her *prima facie* case,

"depending on how strong [that evidence] is." *Id.* at 124.

   Applying this standard to the facts before us, plaintiff has produced sufficient evidence to

defeat summary judgment as to her claim against Goudy-Crosson.  First, plaintiff has satisfied her *de minimus* burden of establishing a *prima facie* case.  There is no dispute that plaintiff, who is Haitian, belongs to a protected class.  Nor is there any dispute that plaintiff suffered an adverse employment action.  The parties do, however, dispute whether she was qualified for her position. Defendants argue that plaintiff's fellow teachers, staff members, parents, students and school administrators who reviewed her performance "each felt [plaintiff] was not performing her duties even remotely satisfactorily" and, therefore, plaintiff cannot meet this requirement of her *prima facie* case.  (Defs. Mem. Supp. Summ. J. at 10.)  However, the Second Circuit has made clear that the plaintiff need only establish "basic eligibility for the position at issue, and not the greater showing that he satisfies the employer" to satisfy the requirement.  *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001). The Circuit explained:

> [T]he qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he possesses the basic skills necessary for performance of the job.  As a result, especially where discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw.

*Id*. (internal quotation marks, citations and alterations omitted).  Plaintiff was certified to teach nursery school through sixth grade.  (Rushfield Aff'm, Tr. Excerpts (Augustin Dep. at 10:2-5).) When she took a medical leave of absence after her assault in June 2003, she returned to work only after she had been cleared by her therapist in August 2004.  Defendants have not argued that plaintiff was not eligible for the positions she held as a teacher in the District.  We cannot rule, as a matter of law, that plaintiff lacked the "basic skills necessary" to perform as an elementary school teacher.

The parties also dispute whether the adverse employment action -- Goudy-Crosson's negative

27

evaluations of plaintiff -- gives rise to an inference of discrimination.  "A plaintiff may rely on direct evidence of what the defendant did and said in satisfying her initial burden."  *Back*, 365 F.3d at 123 (internal quotation marks, citations and alterations omitted).  Plaintiff argues that Goudy-Crosson's immigrant remark of September 8, 2005, combined with Goudy-Crosson's treatment of plaintiff "in a hostile manner," including "writing false evaluative reports about plaintiff" and "failing to follow, in *any* way . . . the EIP supposedly designed to help plaintiff," constitutes direct evidence of discriminatory bias on the part of Goudy-Crosson.  (Pl. Mem. Opp. Summ. J. at 14 (emphasis in original).)  Defendants argue that plaintiff "cannot rely upon the remote, ambiguous, disputed 'immigrant' remark she claims was made . . . by [] Goudy-Crosson to establish . . . direct evidence of discriminatory motive."  (Defs. Mem. Supp. Summ. J. at 14.)

We note first that the disputed nature of Goudy-Crosson's remark does not preclude us from considering it on this motion for summary judgment; rather, whether Goudy-Crosson actually made the statement is an issue of fact for the jury and the jury is entitled, though not required, to credit plaintiff's testimony that Goudy-Crosson made it.  Furthermore, while defendants argue that the statement is "ambiguous," all ambiguities must be construed against the movant, here defendant. *Anderson*, 477 U.S. at 255.  Therefore, for purposes of our inquiry, we assume that the statement was made and that the reference to plaintiff's immigrant status was a reference to her national origin.  *See Thompson v. Am. Eagle Airlines, Inc.*, 2000 WL 1505972, at *5 (S.D.N.Y. Oct. 6, 2000) (Disputed comment to plaintiff -- "'You are nothing but an immigrant, you neither have rights in this country or rights in this company'" -- was sufficient to create inference of discrimination and defeat summary judgment on plaintiff's national origin discrimination claim.).

We now turn to whether the immigrant remark is sufficient to give rise to an inference of

28

discrimination.   The Second Circuit has recently acknowledged that precedents regarding the evidentiary significance of individual statements offered to show direct evidence of discrimination "may have been somewhat confusing."  *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007).  The Circuit clarified that "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination."  *Id.* The court must consider the remark in light of all the evidence taken in the light most favorable to plaintiff.  *Id.*  "The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be."  *Id.*

If the jury believes that Goudy-Crosson made the immigrant remark, it is sufficient evidence of an impermissible discriminatory motive.   Goudy-Crosson, as plaintiff's principal, was her immediate supervisor and, as discussed below, had great influence on the decision-making process that ultimately led to the denial of tenure to plaintiff and termination of plaintiff's employment.  The remark possibly reflected a discriminatory bias that influenced the negative performance reviews of plaintiff that led to her ultimate termination.  *Rose v. N.Y. City Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001) (Supervisor's comment to plaintiff on two occasions that he could replace her with someone "younger and cheaper" were direct evidence of age discrimination, as they "were not the stray remarks of a colleague but rather were comments made directly to her on more than one occasion by her immediate supervisor, who had enormous influence in the decision-making process.").

Although plaintiff testified about only one instance in which Goudy-Crosson commented on her "immigrant" status, the statement must be viewed in the context of the entire record viewed in the light most favorable to plaintiff.  Issues of fact exist as to many aspects of Goudy-Crosson's

management of plaintiff and the veracity of the reports she made regarding plaintiff's performance. There is an issue of fact as to whether Goudy-Crosson indicated that plaintiff was inferior to her. There are issues of fact surrounding Goudy-Crosson's December 14, 2005 classroom observation of plaintiff: whether she gave plaintiff a positive verbal report, whether the negative written report is accurate and whether plaintiff received a copy of the report at the time. There are issues of fact surrounding the implementation of plaintiff's EIP, including the reason Goudy-Crosson did not conduct any formal observations of plaintiff during the designated time period and whether any informal observations were performed. Furthermore, there are issues of fact regarding the veracity of Goudy-Crosson's memo to plaintiff of June 16, 2006, as plaintiff's account of what happened that day differs from Goudy-Crosson's version as memorialized in that memo. Finally, issues of fact exist as to whether Goudy-Crosson shared with plaintiff the negative Teacher Evaluation Reports she prepared about plaintiff for the 2005-06 school year. If the jury were to credit plaintiff's account of these events, it could infer that Goudy-Crosson created false negative reports about plaintiff and failed to properly implement the EIP out of a discriminatory animus, when viewed in conjunction with the immigrant comment. *Tolbert v. Queens College*, 242 F.3d 58, 72 (2d Cir. 2001) ("[I]n determining whether defendants had intentionally discriminated against [plaintiff] on the basis of race, the jury was entitled to view defendants' 'we cut slack' statement in light of the evidence as a whole. That evidence included [plaintiff]'s testimony that the Department had repeatedly changed the ground rules for his completion of the necessary course work" and other evidence of animus toward plaintiff that was not explicitly racial.). Although the record is quite ambiguous and there are many issues of fact to be determined by a jury, plaintiff has set forth sufficient, albeit thin, evidence of discriminatory animus to establish a prima facie case.

Defendants have set forth a legitimate, non-discriminatory reason for Goudy-Crosson's negative evaluations of plaintiff, specifically, plaintiff's alleged poor work performance. Defendants point to evidence of plaintiff's "observable serious classroom management problems" (Defs. R. 56.1 Stmt. ¶ 92) and the need to establish a security post outside her classroom (*id*. ¶ 95). However, issues of fact exist as to the veracity of those evaluations and also as to whether plaintiff's work performance was the *only* reason for the negative evaluations. Plaintiff has shown sufficient evidence of pretext to convince us that the issue should be tried by a jury. If the jury credits plaintiff's testimony that Goudy-Crosson never shared the negative reports with plaintiff and concludes that Goudy-Crosson failed to implement plaintiff's EIP properly, the jury may well also believe that defendants' proffered non-discriminatory reason -- poor work performance -- was merely pretextual and that a real motive for the negative evaluations of plaintiff was discriminatory animus towards plaintiff because of her Haitian ethnicity.

**B.**     **Proximate Cause**

In order to prevail on a § 1983 claim, in addition to proving that a federal right has been violated, the plaintiff must also prove proximate cause; that is, the plaintiff must "demonstrate that the causal connection between the defendant's action and the plaintiff's injury is sufficiently direct." *Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998). The court, in its inquiry, is to apply "ordinary principles of causation." *Back*, 365 F.3d at 125 (internal quotation marks omitted). The Second Circuit has held that an "impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision . . . even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have

31

the impermissible bias played a meaningful role in the . . . process." *Id.* at 125-26 (internal quotation marks citation and citation omitted; alterations in original).

There is sufficient evidence, on this record, of proximate cause to survive summary judgment. Goudy-Crosson was plaintiff's immediate supervisor and was responsible for evaluating plaintiff's performance. As discussed above, issues of fact exist as to plaintiff's job performance and the veracity of Goudy-Crosson's critical reports of plaintiff. These potentially biased reports may well have "tainted" the Board's decision to deny tenure to and terminate plaintiff. Although the Board, not Goudy-Crosson, ultimately made this decision, two of Goudy-Crosson's reports were cited in the Reasons Letter regarding the Board's decision to deny tenure to plaintiff and to terminate her employment. *See id.* at 126 (Finding proximate cause where, *inter alia*, defendants' negative final evaluation of plaintiff was "the sole factor that [the] Superintendent [] cited to [plaintiff] when he informed her that he would recommend that she be terminated."). Furthermore, Leimer testified that the decision was based "in substantial part" on the feedback given by Goudy-Crosson about plaintiff and that the Board did not conduct a separate inquiry into plaintiff's allegations of discrimination. *See id.* (Noting that "[t]he Board of Education was, of course, the ultimate decision maker in the termination, but it appears to have voted without making an independent inquiry into the allegations of discrimination, and directly after hearing the recommendation of [the Superintendent], which was admittedly influenced by the views of [defendants]."). Although other evidence indicates that Leimer and Saturnelli, upon whose recommendation the Board relied, may have decided to terminate plaintiff's employment prior to the commencement of the 2005-06 school year based on plaintiff's alleged poor job performance before her stint at West Street and St. Francis, there is enough evidence that the decision was based substantially on Goudy-Crosson's review of

32

plaintiff that the degree of Goudy-Crosson's influence on the ultimate decision is an issue for the jury.  In sum, we hold that plaintiff has proffered sufficient evidence of proximate cause to survive summary judgment as to Goudy-Crosson.

### C.    Qualified Immunity

Goudy-Crosson has asserted a defense of qualified immunity.  (Defs. Mem. Supp. Summ. J. at 8.)  The doctrine of qualified immunity shields government agents from liability for their official actions, unless their conduct violates clearly established constitutional rights of which an objectively reasonable official would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Almonte v. City of Long Beach*, 478 F.3d 100, 110 (2d Cir. 2007).  A government official sued in her official capacity is entitled to qualified immunity for a constitutional violation if, considering the record as construed in the plaintiff's favor, the constitutional right in question was not "clearly established" at the time of the conduct or if the official's action was objectively reasonable.  *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).  The Court must determine "what a reasonable person in the defendant's position should know about the constitutionality of the conduct."  *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 278 (2d Cir. 1999).

Plaintiff's right to be free from discrimination based on her national origin was well-established at the time of the events that gave rise to this suit.  *See* 42 U.S.C. § 2000(e).  Neither party disputes that a reasonable official would not have thought it acceptable to treat plaintiff differently -- *i.e.*, provide false evaluations and fail to support her in her EIP -- because she is of Haitian decent.  However, the parties do disagree, as discussed above, regarding whether plaintiff was treated differently by Goudy-Crosson because of her national origin.  These genuine issues of

fact are best left for resolution by a jury.

### III.   <u>Section 1983 Claim Against Saturnelli</u>

"An individual cannot be held liable for damages under § 1983 merely because he held a high position of authority, but can be held liable if he was personally involved in the alleged deprivation." *Back*, 365 F.3d at 127 (internal quotation marks omitted).  Personal involvement can be shown by: (1) the defendant's direct participation in the alleged constitutional violation; (2) a showing that the defendant failed to remedy the wrong after being informed of such a violation; (3) the defendant's creation of a policy or custom under which unconstitutional practices occurred; (4) the defendant's gross negligence in supervising subordinates who committed the wrongful acts; or (5) the defendant's "deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring." *Id.* (internal quotation marks and citation omitted; alteration in original).

Viewing the record in the light most favorable to plaintiff, no material facts exist that could support a finding of liability with respect to Saturnelli under § 1983.  Plaintiff contends that Saturnelli was deliberately indifferent to her right to be free from national origin discrimination.  (Pl. Mem. Opp. Summ. J. at 18.)  "Deliberate indifference can be found when the defendant's response to *known discrimination* is clearly unreasonable in light of the known circumstances." *Back*, 365 F.3d at 127 (internal quotation marks and citations omitted; emphasis added).  The standard is not "a mere reasonableness standard that transforms every school disciplinary decision into a jury question." *Id.* (internal quotation marks and citation omitted).

Plaintiff argues that Saturnelli was deliberately indifferent because, before Saturnelli

recommended plaintiff's termination to the Board, Saturnelli was "provided with information from plaintiff, and [Goudy-]Crosson herself, that plaintiff believed that [Goudy-]Crosson was discriminating against her." (Pl. Mem. Opp. Summ. J. at 18.) Plaintiff does not support this proposition with any citation to the record and there is no evidence indicating that Saturnelli knew that plaintiff felt that she was being discriminated against by Goudy-Crosson. Although plaintiff complained to Saturnelli's secretary about alleged discriminatory treatment by Calderin, there is no evidence that Saturnelli personally knew of this complaint. Furthermore, according to plaintiff's theory of liability, Saturnelli did not rely on Calderin's reports but on Goudy-Crosson's reports in recommending the termination of plaintiff's employment.[20] Thus, any knowledge that Saturnelli had that plaintiff was subjected to discriminatory treatment *before* she came under the supervision of Goudy-Crosson is not relevant to our inquiry here.

Although Saturnelli, before recommending the termination of plaintiff's employment, reviewed the reports cited in the Reasons Letter, as well as plaintiff's two letters in response to the Reasons Letter, there is no indication in any of those letters that plaintiff believed that Goudy-Crosson was discriminating against her. At most, those letters indicate that plaintiff disagreed with Goudy-Crosson's assessments of her. Plaintiff argues that Saturnelli could have and should have discerned, from those reports, that Goudy-Crosson had failed to implement plaintiff's EIP. Assuming this is true, this would indicate only that Saturnelli may have been deliberately indifferent to plaintiff's failure to receive a proper evaluation and support from her principal, but being

---

[20] For example, plaintiff argues that Saturnelli must be held liable if she "acted upon negative information provided by *[Goudy-]Crosson* with a sufficient basis to know that such information was likely the product of discriminatory bias." (Pl. Mem. Opp. Summ. J. at 18 (emphasis added).)

subjected to poor management is not a violation of a federal constitutional right.  *See Hess v. ING USA Annuity & Life Ins. Co.*, 2008 WL 433747, at *7 (E.D.N.Y. Feb. 14, 2008) ("A termination based on a misinformed conclusion about performance deficiencies is not actionable and, under the circumstances here, including overwhelming evidence of other performance problems, there is no basis for inferring that [defendant] reached this conclusions because of plaintiff's age.").  Because the undisputed facts indicate that Saturnelli did not harbor any discriminatory animus toward plaintiff and had no knowledge that plaintiff felt discriminated against by Goudy-Crosson, upon whose reports Saturnelli relied in recommending the termination of plaintiff's employment, Saturnelli cannot be held liable under § 1983 and, therefore, we grant defendants' motion for summary judgment with respect to Saturnelli.


## IV.    <u>Section 1983 Claim Against the District</u>

Local government bodies, including school districts, are considered "persons" within the meaning of § 1983, however, they cannot be held liable under this statute solely because of the discriminatory actions of one of their employees.  *Back*, 365 F.3d at 128, citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  In other words, the doctrine of *respondeat superior* does not apply to municipalities; liability arises only if the District acted pursuant to an official policy or custom.  *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983).  To prevail on a § 1983 claim against a municipality, plaintiff must prove "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Id.*  Furthermore, a "single unlawful discharge, if ordered by a person whose edicts or acts may fairly be said to represent official policy, can, by itself, support a claim against a municipality."  *Back*, 365 F.3d at 128 (internal quotation

marks omitted).

On this motion, plaintiff has not set forth any argument that the District engaged in a policy or custom of national origin discrimination. (*See* Pl. Mem. Opp. Summ. J. at 18-20.) Nor does she argue that Goudy-Crosson was a policymaker for purposes of establishing District liability. (*See id.*) As one court has stated:

> New York state law is dispositive on the issue of whether a school superintendent has final policy making authority. . . . Under New York law, the decision to terminate a probationary teacher is made by the board of education upon recommendation of the superintendent of schools. . . . As such, the board of education is the final decision maker and not the superintendent of schools.

*See Simpson v. Enlarged City School District of Newburgh*, 2007 WL 2789512, at *6 (S.D.N.Y. Sept. 26, 2007) (internal citations omitted). Thus Saturnelli, in her position as Superintendent, is not a policy maker and any action by her does not impose liability on the District.[21] *See id.* (holding that Superintendent Saturnelli is not a policy maker of the Enlarged City School District of Newburgh for purposes of District liability).

Although the Board is a final policy maker, there is no allegation that any member of the Board evinced a discriminatory animus toward plaintiff. Nor is there any evidence that the Board was "deliberately indifferent" to plaintiff's claims of national origin discrimination or to show that "the defendant intended the discrimination to occur," because plaintiff has not introduced any evidence that any member of the Board knew that plaintiff felt she was being discriminated against by Goudy-Crosson. *Back*, 365 F.3d at 128. Plaintiff points out that in *Back*, the court, in finding that

---

[21] Furthermore, as discussed above, a review of the record fails to reveal any evidence that any of Saturnelli's actions give rise to an inference of racial bias or discrimination and, therefore, her actions cannot be the basis of District liability either.

the Board of Education had not been deliberately indifferent to plaintiff's claims of gender discrimination when they terminated her, noted that the board had appointed an independent review panel to investigate plaintiff's situation, whereas here the Board made no such independent review of plaintiff's situation.   However, in *Back*, the board had knowledge of plaintiff's discrimination claims, whereas here, as discussed above, there is no evidence that the Board had such knowledge. *Id*. at 116, 129.   Because the undisputed facts indicate that the Board did not harbor any discriminatory animus toward plaintiff and had no knowledge that plaintiff felt discriminated against by Goudy-Crosson, upon whose reports the Board relied in recommending plaintiff's termination, defendants' motion for summary judgment with respect to the District is granted.

## V.    New York State Law Claim

"New York Education Law § 3813 provides that in order to maintain a claim against a School Board, a School District or its employees, a plaintiff must first serve a notice of claim on defending parties as required under the New York General Municipal Law §§ 50-e and 50-i.  This requirement applies to discrimination claims brought pursuant to New York Executive Law § 296."  *Taylor v. Brentwood Union Free Sch. Dist.*, 908 F. Supp. 1165, 1175 (E.D.N.Y. 1995) (internal citations omitted). There is no dispute that, here, plaintiff never filed a notice of claim.  Nor has plaintiff sought leave to file a late notice of claim.  Plaintiff argues that courts in this Circuit are split on the issue of whether the notice of claim requirement applies to § 296 claims, however, a review of recent case law reveals that federal courts in this district routinely grant summary judgement with respect to discrimination claims brought under New York state law on the basis of failure to file a notice of claim.  *Collier v. City of New York*, 2009 WL 464937, at *7 (S.D.N.Y. Feb. 25, 2009); *see, e.g.,*

*Santiago v. Newburgh Enlarged City Sch. Dist.*, 434 F. Supp. 2d 193, 196 (S.D.N.Y. 2006) (In employment discrimination case, "[n]one of plaintiff's state law claims [were] cognizable because the plaintiff ha[d] not filed a notice of claim in connection therewith."); *Marrero v. City of New York*, 2004 WL 444548, at *3 (S.D.N.Y. Mar. 10, 2004) (Plaintiff's "[s]ection 296 claim [was] . . . barred by his failure to file a timely notice of claim.")

The § 3813 notice of claim requirement applies only to cases "which seek the enforcement of private rights, as opposed to those actions that seek vindication of a public interest." *Biggers v. Brookhaven-Comsewogue Union Free Sch. Dist.*, 127 F. Supp. 2d 452, 455 (S.D.N.Y. 2001). "Although all actions brought to enforce civil rights can be said to be in the public interest," *Bloom v. N.Y. City Bd. of Educ.*, 2003 WL 1740528, at *14 (S.D.N.Y. Apr. 2, 2003), only "actions that seek relief for a similarly situated class of the public" are entitled to relief from the notice of claim requirement. (Internal quotation marks and citation omitted.) Here plaintiff seeks enforcement of a private right, as she seeks relief in the form of money damages and placement in a tenured position with the District on the basis that she alone was denied such a position on the basis of her national origin. *See Biggers*, 127 F. Supp. 2d at 455 (Plaintiff's claim characterized as enforcement of a private right where "[h]er allegations of discriminatory conduct on the part of the School District refer only to conduct as it relates to her" and she sought only money damages for her own financial [loss] and emotional suffering.). Thus, this exception does not apply. Consistent with other courts in this district, defendants' motion for summary judgment with respect to plaintiff's state law claim brought under New York Executive Law § 296 is granted.

## CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment (Doc. # 12) is granted with respect to all claims against defendants Annette Saturnelli and the Enlarged City School District of Newburgh (the "District"), granted with respect to the state law claims against defendant Joan Goudy-Crosson and denied with respect to the federal claims against defendant Goudy-Crosson. All claims against defendants Saturnelli and the District are dismissed with prejudice and without costs or attorneys fees.

SO ORDERED.

Dated:  White Plains, New York
          May 11, 2009

_William C. Conner_
Sr. United States District Judge

40